Filed 2/11/21  P. v. Holland CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CHRISTOPHER MELVIN HOLLAND,<br><br>  Defendant and Appellant. | H042634<br>(Santa Clara County<br> Super. Ct. Nos. CC783064, C1111557) |

Christopher Melvin Holland appeals from the judgment entered after a jury found him guilty of the murder of Cynthia Munoz with a rape-murder special circumstance. Holland was sentenced to life in prison without the possibility of parole.  Holland contends that his conviction must be overturned for two reasons.  First, he contends that the trial court erroneously denied his motion for a mistrial after a witness testified in violation of the court's pretrial order to evidence implying that Holland had admitted to committing two murders unrelated to this case.  Second, the trial court excluded what Holland contends was relevant and critical third party culpability evidence.  Holland contends that these errors, separately and together, violated his right to due process and restricted his ability to present a complete defense.  Holland also seeks to correct errors in the amount of the restitution fine and in the imposition of a parole revocation fine.

For the reasons discussed below, we find no reversible error as to the judgment of conviction.  We modify the judgment to correct the restitution fine and parole revocation errors.

# I. PROCEDURAL HISTORY

## A. Charges

The Santa Clara County District Attorney filed an information in August 2014 charging Holland with two counts of murder (Pen. Code, § 187)[1] and alleging rape as a felony-murder circumstance in both counts (§ 190.2, subd. (a)(17)).  The information also alleged a multiple-murder special circumstance (§ 190.2, subd. (a)(3)).  The first count charged Holland with the murder of Cynthia Munoz on or about August 7, 1983.  The second count charged Holland with the murder of Tara Marowski on or about March 28, 1983.  After proceedings, the trial court granted a defense motion to sever the two counts. The trial court later granted the prosecution's motion to dismiss, without prejudice, the charge for Marowski's murder.

## B. Jury Trial and Sentencing

Trial for the murder of Cynthia Munoz took place in February and March 2015. The prosecution's theory was that Holland raped and murdered Munoz in the early hours of August 7, 1983, in a house in Campbell where she lived with her boyfriend and her boyfriend's mother, sister, and brother.  The defense's theory was that Holland had consensual sex with Munoz and that somebody else later robbed and murdered her— probably a neighbor and friend of the group named Brian Mendes.  Mendes died in 1994.

One of the contested issues at trial centered on the testimony of Christine H.,[2] a former girlfriend of Holland who told the district attorney's investigator that there was a time in 1994 that Holland appeared very scared because he had seen a news report that police were reopening an investigation into two cold cases.  She said that Holland told her he had done it.  The trial court admitted the testimony over the defense's objection

---

[1] Unspecified statutory references are to the Penal Code.

[2] To protect the personal privacy of certain witnesses in this case, we refer to them using only their first name and last initial.  (See Cal. Rules of Court, rule 8.90(b).)

but directed the prosecutor to elicit testimony about only a single cold case.  On the stand, however, Christine H., referenced "two murders."  Defense counsel moved immediately for a mistrial, which the trial court denied.  We consider the consequences of Christine H.'s testimony and the motion for mistrial in the discussion, *post*, part III.A.

Another contested issue was the admissibility of a statement that Brian Mendes made at a gathering a few years after Munoz's murder, in which he described choking or strangling a girl.  The defense sought to introduce the statement as a declaration against Mendes's penal interest and argued it was critical defense evidence showing that Mendes, not Holland, likely killed 17-year-old Munoz.  The trial court excluded the evidence on the ground that unlike other evidence involving Mendes, his statement was nonspecific and did not link him directly or circumstantially to the perpetration of the crime.  We consider the trial court's exclusionary ruling in the discussion, *post*, part III.B.

On March 23, 2015, the jury found Holland guilty of the first degree premeditated murder of Cynthia Munoz and found true the rape-murder special circumstance.

On July 2, 2015, the trial court sentenced Holland to life without the possibility of parole.  The court found that Holland was entitled to 4,221 days of credit based on 2,815 days of actual credits and conduct credits of 1,407 pursuant to section 4019.  It ordered Holland to pay a restitution fine of $200 and imposed but suspended a parole revocation fine of $200.  We discuss the imposition of these fines *post*, part III.D.  Holland timely appealed from the judgment.

## II. FACTUAL BACKGROUND

### A. Circumstances Surrounding the Murder of Cynthia Munoz

#### 1. David Lawson and Robert Prater

In August 1983, David Lawson lived in a house in Campbell with his mother, Betty W., his 15-year-old sister, Stacy, his 21-year-old brother, Jamie, and 17-year-old

3

Cynthia Munoz, who was Jamie's girlfriend.[3] Jamie was a quadriplegic. Munoz's relationship with Jamie was "[v]ery loving" and they were talking about getting married.

On Saturday, August 6, 1983, David, who was 18 years old at the time, met his 16-year-old friend, Robert Prater, Jr., at David's house. Jamie was in the hospital with an infection. Munoz was visiting Jamie. She and Betty had driven to the hospital in the Lawsons' van. That was the last time that David saw Munoz alive.

David and Prater spent the afternoon and night partying, drinking alcohol, and using drugs. They met up with Prater's girlfriend and another female friend. The four of them spent some time at the house in Campbell and at other locations.

Sometime after 3:00 a.m. on August 7, 1983, Prater and David dropped off their dates and returned to the Lawsons' house. The front door was locked. Prater waited while David went in through the back. Prater heard David screaming. David was "freaking out" as he opened the front door. Prater followed him down the hallway and saw Munoz's body, naked and "spread eagle" on Stacy's bed, with her legs hanging off the bed as though someone had just been having sex with her. Her breasts were exposed. She had multiple stab wounds. David covered her and moved her body somewhat in the process. One of them called the police, who arrived quickly.

Prater was "extremely high" that night. The drugs that David and Prater used during that time period included "crank" and LSD. The drugs made Prater "[a]wake" and "alert." He could still function.

David and Prater were interviewed at the police station that morning. They each provided a blood sample to the police. Prater did not remember at trial what he described to police but testified that whatever statements he made to the police at the time were

---

[3] Jamie Lawson was deceased at the time of trial. We refer to the Lawson family by their first names to avoid confusion. David Lawson testified at trial.

truthful. David also testified that he told the police the truth about everything he had seen that night.

Prater and David were familiar with Brian Mendes, who lived in the neighborhood, and with Holland, who hung out with Mendes. Holland and Mendes were close friends. They were often together and rode bicycles. They were friends with Jamie. Mendes would sometimes hang out at the Lawsons' house. David did not remember Holland visiting the house before Munoz's murder but would see him in the neighborhood and across the street at Scott Wortman's house.

Prater testified at trial that he had seen both men riding bicycles near the Lawsons' house on the day before the murder. A white 10-speed bicycle was in front of the house when David and Prater arrived there around 3:00 a.m. Prater testified that he saw Holland riding a similar bicycle that day, but when interviewed by the police on August 7, 1983, he had said that he did not know whose bicycle it was.

Prater lived about a half block from the Lawsons' house. He testified that when he returned home from the police station later on the day of the murder, Mendes came to his house. Mendes was "crying, whining, crying, not knowing if he did it or not." Prater recalled speaking with an investigator from the district attorney's office in 2007 but did not remember saying that Mendes was crying and saying " 'they' " had raped and killed Munoz. Prater was afraid of Mendes and at the time was afraid of Holland too. Prater had a felony conviction for transporting and selling drugs, and two juvenile adjudications for residential burglary.

David testified that Holland began dating his mom, Betty W., about a month after Munoz was murdered. David never saw anything to suggest that Holland dated Betty W. before Munoz's murder, or that Munoz had a relationship at any time with Holland.

5

## 2. *Stacy*

David's sister, Stacy, was 15 years old at the time of the murder. Stacy lived in the house in Campbell and had her own room. Munoz shared Jamie's room.

On Saturday August 6, 1983, Jamie had been in the hospital for at least a few days. Stacy and Munoz visited him around 11:00 a.m. and stayed the whole day. They left the hospital in the evening after 5:30 p.m. Munoz was driving the Lawsons' van and dropped Stacy at home. David was there with Prater and two female friends. Stacy argued with David, then went across the street to the house of their neighbor Scott Wortman, who was around Jamie's age. It was still light out. Several people were outside of Wortman's house, including Mendes. Stacy fell asleep in Wortman's living room. It was dark when she woke up. Wortman and Mendes were the only people left.

Stacy left with Wortman and Mendes to look for a party. They spent about 45 minutes to an hour circling Lexington Dam looking for the party, then returned to Wortman's house. When they got out of the car, Stacy saw the Lawsons' van parked in their driveway. She believed Munoz was home because Munoz had driven her in the van earlier that day. She denied telling the police after the murder that she saw Munoz walk from the van into the house. Stacy started to cross the street to tell Munoz where she was, but either Wortman or Mendes said they could call her. Stacy stood with Wortman on the driveway and held a flashlight while he installed a stereo in the car. Mendes went into Wortman's house. After a few minutes, Stacy went inside to use the restroom. She did not see Mendes inside and did not know where he was. She returned to the car and continued to help Wortman install the stereo. From where she was working on the car, she would have seen if someone had exited Wortman's house and crossed the street.

Mendes reappeared next to the car after about 15 or 20 minutes. There was nothing unusual about his demeanor or appearance. He was not flustered or out of breath. Stacy, Mendes, and Wortman went to a convenience store where the men bought beer. Stacy testified that it was before 2:00 a.m. at that point because they were still able

6

to buy the beer.  They drove to the beach in Santa Cruz and watched the sunrise.  When they returned home, Stacy saw the police at her house and learned of the homicide.

Stacy testified that the white 10-speed bicycle was not in front of the house when the van was parked in the driveway and she was across the street with Wortman.  She first saw the bicycle when they returned from Santa Cruz.

Stacy had known Mendes for as long as she could remember.  He was a friend of Jamie's and sometimes slept over at their house.  When Stacy was younger, Mendes molested her several times by groping her roughly.  He never tried to rape her.  On the evening of the murder, Stacy at one point had asked Mendes to buy her ice cream and he had refused because he did not have money.  Later that night, when they stopped at the convenience store to buy beer on the way to Santa Cruz, he bought her a whole box of ice cream.  Stacy did not know where he had gotten the money.

Holland, like Mendes, was part of the group that hung around the neighborhood.  Holland was friends with Jamie, with Stacy's mom, Betty W., and with her older sister, Sherry.  Stacy had seen Holland at parties hosted by her brother or mother.  It "seemed like right after" the homicide that Holland started dating Betty and moved into the house.  Stacy tried to stay away from her house as much as possible.  She felt safe with Wortman but did not feel safe alone with Mendes.

Defense counsel cross-examined Stacy about inconsistencies between her trial testimony, her statements to the police after the murder, and her statements during the reopened investigation in 2007.  Stacy testified that it was about 1:00 a.m. when she and Wortman and Mendes returned from Lexington Dam; she denied telling the detective at the time that it was about 2:00 a.m.  Stacy also denied telling the detective that she had seen the van come into the driveway around 2:30 a.m. and had seen Munoz walk to the front door.  And she denied telling the detective that when Mendes reappeared, he came from around a camper that was parked north of the house, closer to the Lawsons' house.  Stacy agreed on cross-examination that she thought it was odd that Mendes had money to

7

buy ice cream and beer on the way to Santa Cruz but could not buy her an ice cream earlier.

3. ***Betty W.***

Betty W. was the mother of Jamie, David, Stacy, and Sherry.[4] Betty testified that Munoz lived with them for almost a year before her murder. Munoz and Jamie were "perfect together." They were in love and planned to get married. Munoz helped with Jamie's care. Munoz was always either with Betty or with Jamie.

Betty was at home in Campbell on the Saturday morning before the murder. She and Munoz had spent Friday evening in the hospital with Jamie. After their visit, Munoz had driven the Lawsons' van back to the hospital and spent Friday night with Jamie. She returned to the house on Saturday. Around 6:00 p.m. on Saturday, Betty and Munoz returned to the hospital together. Munoz later dropped Betty at a friend's house and went back to be with Jamie. Betty spoke with Munoz around midnight. Munoz was still at the hospital. She planned to go home and shower. Betty told Munoz that she could keep the van because Betty was staying with her friend. That was the last time they spoke.

Betty told police that Munoz had been wearing lavender pants and a lavender and black striped blouse. Betty knew the friends who hung out with David and Jamie, including Mendes. She did not want Mendes at the house. Betty told police that on the morning before the homicide she had found Mendes sleeping in the carport with a trail of Valium from the couch to the front door. She believed that Mendes would sometimes steal Jamie's medications, which included Valium and Darvocet. She also reported that she had noticed money missing from her purse.

Betty met Holland after the homicide. Jamie knew Holland's younger brother, and Holland would stop by the house and help Jamie with tasks because Jamie could not

_____

[4] Sherry was Betty W.'s older daughter. She had already moved out of the house at the time of the homicide.

move his hands.  Betty started to date Holland in September or October of 1983.  They dated for three or four months.  She would see Holland hanging out with Mendes and others across the street.  Holland carried a knife on his belt.

In the days after the homicide, Betty discovered that some jewelry was missing from the bedroom that Munoz shared with Jamie.  A gold chain with a gold unicorn pendant was also stolen from Betty's room.  She later told Holland that the necklace was missing.  He replied that he thought he knew who had it, and he got it back for her.

### 4.  *Other Percipient Witnesses*

Suzanne Nieto was Munoz's best friend.  They were both 17 years old at the time of the murder.  Nieto had dated David and knew Jamie.  Munoz's relationship with Jamie was loving and dedicated.  Jamie's quadriplegia was not an impediment.  Munoz would never have cheated on him.  Nieto and Munoz had talked about Holland and found him creepy.

Munoz's sister, Stephanie, testified that her sister was her best friend.[5]  They were close in age and saw each other regularly.  Munoz and Jamie were in love and were going to get married.  Munoz would not have cheated on Jamie.  Stephanie last spoke with Munoz the night before she was killed, around 10:00 p.m. or later.  Munoz was at the hospital with Jamie, and Stephanie briefly said "hi" to him to see how he was doing.  But in speaking with the district attorney's investigator in 2007 about the evening before the murder, Stephanie said that she and Munoz had a fight and were not talking that day.

Virginia Stewart was a registered nurse in 1983.  She met Munoz while working at the hospital where Jamie was a patient.  Stewart worked the swing shift at the time, arriving in the afternoon and finishing at 11:45 p.m.  Munoz was there "every day with Jamie" and was often getting ready to leave when Stewart's shift was ending.

---

[5] We refer to Stephanie Munoz by her first name to avoid confusion with the victim Cynthia Munoz.

9

Stewart saw nothing in the week leading up to Munoz's death to suggest that Munoz might have been romantically involved with someone other than Jamie.

## B. Law Enforcement Testimony

Retired City of Campbell Police Officer Russell Patterson was called to the crime scene. Patterson interviewed Mendes and Stacy that morning. Patterson noted in his report that Mendes said something to the effect of " 'Brian did it' " because he was acting " 'crazy' earlier in the evening." Mendes told him that he, Wortman, and Stacy were out all night, and that he did not have to talk or give incriminating statements. Patterson testified that he would have noted at the time if anything suggested to him that Mendes was involved in the crime. Paterson ended the interview because they were not getting anywhere. Mendes was intoxicated and uncooperative.

Patterson interviewed Robert Prater a few days later. Prater said that he and David pounded on the front door and window before David went to the back door. Prater waited a minute or two and heard David shouting, " 'She's dead. She's dead.' " Prater did not mention the names Brian Mendes or Chris Holland. He did not mention knowing who owned or used the white 10-speed bicycle found at the house.

Steven Dippell was the lead detective on the case and a police sergeant for the City of Campbell. Dippell oversaw the crime scene investigation. There was a hospital bed in Jamie's and Munoz's room. Munoz's purse was on the bed. It contained papers and keys, but no wallet. A pair of leather sandals and a lavender sock were at the foot of the bed. The lock on the back door of the house was not functional.

In constructing a timeline of where Munoz had been in the hours before her death, Dippell noted there was about an hour of time that was unclear. Stacy told him that she had seen the van pull into the driveway at 2:30 a.m. If Stacy's statement about seeing Munoz arrive at 2:30 a.m. was accurate, that would leave a gap of over one hour from the time Munoz left Jamie at the hospital. If Stacy was incorrect about the time and it was

10

about 1:30 a.m. when she saw the van in the driveway, that would eliminate the gap in the timeline.

Dippell interviewed Mendes on three separate occasions after the murder, on August 9, 10, and 14.  In a recorded interview, Mendes denied killing Munoz but also said that he did not know what he did.  He said that he was spaced out on drugs and had been shooting heroin.  He told Dippell, " 'I don't think I went over there.  I'm not sure.  I don't know.' "  Mendes said that he did not believe, inside himself, that he did it, but because he was blacked out he did not know what he did.  He remembered helping Wortman and Stacy install the car stereo, and the next thing he remembered was going to the beach in Santa Cruz.  When asked whether he mumbled something like " 'I really shouldn't have killed her' " in front of others that week, Mendes said that he had been spaced out, " 'not even been on this planet,' " for the last week.  He did not recall making the statements.  Mendes added, " 'The whole scary part is I don't know if I did or didn't,' " referring, as Dippell understood, to Munoz's murder.  When Dippell told him that a witness thought he had been gone for 30 minutes while Wortman and Stacy worked on the stereo, Mendes responded, " 'If I was gone for 30 minutes, then I did it' " and immediately added, " 'I don't think I did, though.' "  Mendes was crying and upset at times during the interview.

Mendes gave police the clothes he wore the night of the incident and showed Dippell scratches on his arm, which he thought were from falling off his bicycle.  A scratch between his elbow and wrist appeared to be infected.  Mendes also gave a blood sample.  Mendes told Dippell that after driving to Lexington Dam to look for the party, he, Wortman, and Stacy drove directly to Santa Cruz, which Dippell noted was inconsistent with the information provided by Stacy and Wortman.

Dippell investigated Mendes as a possible suspect but never arrested him for Munoz's murder.  He received names of other persons of interest in that time frame, including Holland.  Dippell briefly contacted Holland in November 1983.  He did not

11

obtain a blood sample. Dippell's reports do not mention anything about someone providing an alibi for Holland.

David Dehaan is a retired police captain for the City of Campbell. He was among the officers first dispatched to the Lawsons' house after the murder. Two days later, on August 9, 1983, Dehaan responded to a disturbance at a gasoline station involving Mendes. Mendes was intoxicated and his speech was slurred. Mendes told Dehaan that he fell off his bicycle and broke the handle on his knife. He was wrapping the handle of a knife, trying to repair it. Mendes was cooperative during the encounter. Dehaan patted him down and asked for the knife, which Mendes gave him. Mendes had several types of pills in his pockets, totaling over 50, including five Darvocet tablets. Mendes told Dehaan that he had obtained the prescription pills from his friend Jamie. There was also a gold or silver pendant with a unicorn design.

Michael Joseph Schembri testified that in 2007, he was an investigator working on cold case homicides for the Santa Clara County District Attorney's office. Schembri interviewed Robert Prater at his home in August 2007. Prater was "very nervous" speaking to Schembri and was concerned for his safety and his family's safety. He asked Schembri not to record the interview. He told Schembri that later on the day of the homicide, Mendes came to his house and told him that he and Holland had raped and murdered Munoz. Prater said that his father and stepmother were there and heard Mendes's statement. Prater told Schembri that he did not tell the police at the time because he was afraid of Holland. Schembri called Prater on the phone later that day and recorded the conversation. Prater confirmed what he had said earlier but was less emphatic and used "they" to mean Mendes and Holland. Prater was fearful that Holland would find out he had spoken to the investigator.

On cross-examination, Schembri confirmed that in the recorded interview, Prater denied saying that Mendes had " 'specifically mentioned Chris' " or had said " 'they had raped and killed' " the victim. Prater instead explained, " 'No. That's who he was

12

running with at the time. I don't—that's who—you know, they were together.' "
Schembri did not try to contact Prater's father or stepmother to corroborate Prater's statement about Mendes coming to the house.

Schembri made several attempts to locate Holland on an arrest warrant for Munoz's murder, issued in the fall of 2007. After trying several locations, officers found and arrested Holland on October 18, 2007. He was hiding in the closet of an apartment. The officers had to forcibly remove Holland after he refused to come out.

Additional testimony by law enforcement officers pertained to an alleged rape in Campbell in July 1985. The officers responded at about 1:30 a.m. on July 18, 1985, to a call about a rape in Campbell Park. The complainant, Debra W., described the suspect. The officers visited a nearby lounge and verified some of the description information, including the suspect's appearance, clothing and tattoos, his bicycle, a knife sheath worn on his right side, and that his first name was Chris.

Debra W. gave a statement. She told an officer that the man reached into a backpack saying he was going to get a cigarette and pulled out a knife, which was a cardboard cutting razor-type knife, then pushed her down, pulled down her pants, and penetrated her vagina with his penis. She was afraid that he was going to kill her. Debra W. refused to give the name of the first bar she went to with the man, saying she did not want to involve those people. She gave the officers the name of the second location and said that the suspect had argued with the bartender there. She declined to go to the hospital for a sexual assault examination even after officers encouraged her to cooperate.

Kevin Austin, a police sergeant for the City of Campbell in July 1985, conducted the follow-up investigation of the alleged rape. Austin showed Debra W. a photo lineup. One of the photographs was of Holland. Austin believed that he placed Holland's photo at No. 2 of six subjects. He did not use a book format. After hearing the standard admonition for a photo lineup, Debra W. "rather quickly" selected No. 2. The district attorney's office ultimately declined to prosecute the case.

### C. Medical and Forensic Evidence

The county coroner who performed the autopsy on Munoz was deceased at the time of trial. Dr. Joseph O'Hara, the county's deputy medical examiner and an expert in forensic pathology, reviewed the autopsy report and associated materials. Dr. O'Hara testified that the cause of death was manual strangulation and stab wounds to the neck resulting in blood loss. Munoz had eight superficial stab wounds to her neck and chest, a blunt force injury to her left eye, and injuries suggestive of strangulation, including small broken capillaries on her facial skin and in her eyes, abrasions and contusions and lacerations on her neck, and abutted hemorrhages in the soft tissue of her neck, under the skin. There were no injuries observed to her hands or her genitalia.

Photographs from the autopsy showed Munoz partially clothed, in a white t-shirt and robe, and naked from the waist down. The shirt was covered with blood, consistent with the stab wounds to the neck. The coronary report documented that the vaginal smear taken from Munoz showed " '[m]any intact sperm cells and sperm heads.' " Dr. O'Hara interpreted "sperm cell" to mean intact sperm cell with a head and a tail. He opined that the lack of injury to the genitalia could support an inference of consensual sexual activity as well as an inference of rape with no injury to the genitalia, and "either scenario could be valid."

Laura Futrell testified as an expert in forensic DNA. Futrell worked as a DNA analyst at the Santa Clara County District Attorney's crime laboratory in 2007. She conducted DNA testing on biological evidence from Munoz. The items included two vaginal swabs from Munoz and blood samples from Munoz, Prater, David Lawson, and Mendes. Testing of the vaginal swabs detected spermatozoa and a protein present in seminal fluids. The sperm cell fraction showed a mixture of two people—Munoz based on the DNA profile developed from her blood sample, and an unknown male contributor. Prater, David Lawson, and Mendes were each eliminated as a contributor to the profile.

14

Futrell later obtained a blood sample for Holland, whose DNA profile showed that he was the male contributor. Futrell observed intact sperm heads without the tail, as would be expected from a sample that had been stored for many years. Sperm cells with tails would represent a very fresh sample. She agreed on cross-examination that sperm can exist inside a vagina for at least up to 72 hours. She could not estimate how long Holland's sperm had been inside Munoz before the sample was removed. Futrell rated the concentration of sperm cells per field observed at "plus three" which is one step below the highest concentration. Futrell opined that a higher concentration of sperm cells suggests a more recent sexual encounter, but she could not estimate how long the cells had been there.

Kristin Cardosa is a criminalist at the Santa Clara County District Attorney's crime laboratory. She testified as an expert in forensic DNA. Cardosa performed a pubic hair wash and DNA analysis on Munoz's pubic hair clippings. Holland was the source of the sperm cells extracted from the pubic hair sample. She rated the sperm concentration at plus-three. Cardosa opined that to find that concentration of sperm in pubic hair six to 12 hours after sex would be less likely if the victim had engaged in daily normal activities after sex, and more likely if the victim died shortly after sex. Cardosa agreed on cross-examination that the plus-three rating does not allow the lab to determine the time when the sperm was deposited. She believed that a "fair time frame" was between 3:30 p.m. and 3:30 a.m., when Munoz died.

Cardosa confirmed that blood stains on a pair of purple corduroy pants included Munoz as a possible contributor to the major DNA component. She tested the zipper and button area of the pants and found male-specific DNA present that was a partial profile and a mixture of at least two individuals. These characteristics made it "hard" to draw conclusions, though Mendes and Prater were excluded as possible contributors to the partial DNA mixture. Holland was excluded as a possible contributor to the major DNA component of the DNA from the stain near the zipper of the pants but could not be

15

excluded from the minor component. She swabbed other areas of the robe and white t-shirt worn by Munoz for DNA testing but could not make conclusive findings. The extracted DNA was either degraded or partial or contained multiple contributors which could not be distinguished. Cardosa confirmed on cross-examination that various genetic markers found on specimens taken from the robe did not come from Holland or from Munoz. The t-shirt samples contained a mixture of at least three persons, at least one of whom was male. She could not definitively include or exclude any of the people involved in the case.

Lynne Burley is the supervising criminalist and DNA technical leader for the Santa Clara County District Attorney's crime laboratory. Burley testified as an expert in forensic DNA analysis. She conducted DNA testing and analysis in 2007 of fingernail clippings from Munoz. The clippings contained a mixture of DNA profiles, which excluded Holland as a contributor, as well as Mendes, Lawson, and Prater. People who cohabitate with others commonly have mixed DNA underneath their fingernails.

Burley also tested three vaginal slides from Munoz's autopsy. She examined the slides under the microscope and rated the concentration of sperm as a plus-three. Many of the sperm had tails on them. She compared the sperm to the DNA reference samples developed in the case and excluded Mendes, Prater, and Lawson. Burley emphasized that the concentration of sperm does not indicate when the semen was deposited. But even considering that men have varying sperm counts in their ejaculate, a rating of plus-three indicates the deposit "was fairly recent . . . ." The testing also detected one allele that was foreign to Holland, indicating a second semen contributor. The second contributor was about 10 percent of the DNA contributed by Holland. The contributor of the foreign allele was not consistent with Mendes. It would be consistent in Burley's experience with a scenario where Munoz had sexual intercourse with her boyfriend two or three days

16

before the vaginal specimen was collected.[6] The DNA contributed by Holland would be consistent with a deposit within 12 hours of the time the specimen was collected—so around 12:30 a.m. if the autopsy was conducted at 12:30 p.m.

Burley testified that the consensus in the forensic community is that a sperm cell can remain present in a vaginal cavity for about three days, though there is literature showing sperm can last longer. Burley testified that finding sperm with tails indicated recency, because tails are "fragile" and "typically fall off very shortly after intercourse." She said it was "very infrequent" to see intact sperm with tails. Based on data from their laboratory and published studies, she would not expect to see tails after about 12 hours. Sperm will be preserved longer in a person who is lying down or immobile. In a hypothetical where a victim was murdered at about 3:00 a.m. and the autopsy was performed nine hours later, a vaginal sample showing intact sperm cells with tails would suggest the victim "had intercourse before she passed" and would be consistent with the opinion that the intercourse occurred at or near the time of death. Burley agreed on cross-examination that it was "also a possibility" in the hypothetical that the victim had intercourse several hours before her death.

Dr. Norah Rudin testified for the defense as an expert in forensic science and DNA. Rudin explained that the rating system of sperm in a field is subjective to some extent on the judgment of the analyst. She opined that it would not be unusual to find sperm with some tails and a plus-three rating that was deposited 16 to 24 hours prior to the collected sample at autopsy. Rudin testified that according to journal articles, sperm tails are most frequently found " 'on swabs taken within one hour of intercourse' " but " 'are commonly found up to 16 hours' " after and, rarely, " 'have been found as late as 72 hours,' so three days in."

_____

[6] Other testimony at trial established that Jamie was able to have sex.

Rudin stated that according to the findings of the journal article, sperm was detected at a plus-three rating in 40.5 percent of samples taken at 24 hours after intercourse, and at about 8 percent of samples taken at 36 hours after intercourse. She opined that based on the vaginal swab and slide specimen findings in this case, it would not be unusual or unexpected for the interval to be around 24 hours as a "reasonable" interpretation of the data. It could have been less than or more than 24 hours.

Rudin agreed on cross-examination that most studies she had seen suggested that both sperm and sperm tails decline with time. She agreed that her opinions were based primarily on published studies while Lynn Burley's opinions were based on her experience reviewing cases in the lab. Rudin held Burley in high regard as an expert.

Burley testified in rebuttal that an expert cannot timestamp when intercourse took place based on evaluating a sample but can offer an opinion as to what interval certain observations are most likely to occur. She noted that sperm with tails "were not difficult to find on the slides" in this case. She testified based on the literature and her crime laboratory experience that "less than 12 hours" is what is "most common for the sperm rating and the spermatozoa with intact tails . . . ." She ordinarily would expect the quantity of sperm to decrease at a different rate outside the body, such as on pubic hair, than inside the body. To observe plus-three sperm rating on both the pubic hair sample and vaginal samples would suggest "someone is in the prone position or sedentary" because "seeing the same sperm rating on an exterior and interior sample is not something I commonly see." She agreed that findings of plus-three with some tails is "possible" up to 24 hours after intercourse but stated it would be "significantly more common" to see that rating at around 12 hours.

## D. Evidence Code Section 1108 Testimony of Other Sexual Offenses

Dolores H. met Holland when she was 13 or 14 years old. Holland was three or four years older. Holland made her feel special and made her think it was okay to have sex. They had sex "[w]henever he wanted." It did not matter if she cried or asked him to

stop. She testified that Holland was "always very brutal." He held her down by her wrists or hands and would not let go, putting his body on top of her. He would hold her legs together and whisper in her ear that she knew she liked it. He seemed to enjoy the fact that she wanted him to stop and showed no concern that he was hurting her. He became violent when she tried to get him off of her, hitting her in the face with his fists and grabbing her neck. He squeezed her neck and choked her after she told him she did not want to have sex. It happened many times.

Dolores H. married Holland when she was 17 or 18. She was pregnant with his son, and Holland was arrested and taken to court. She filed for divorce while he was in prison. They had contact over the years after that. She later began to understand that sex with Holland was rape "all that time" because she said no and it did not matter.

Dolores H. admitted on cross-examination that there were times "years later" that she had consensual sex with Holland, contradicting her earlier testimony that she never had sex with him after he went to prison. There was a time after their divorce that they got into an argument while at his mother's house, and Holland got angry and put a knife to her throat. She said that she had called the police on him a couple of times. She never reported being sexually assaulted because she was afraid of what he would do if he found out. She used to use methamphetamines with Holland. There were times after they broke up that she sought him out to get drugs.

Mary L. dated Holland for several months in 1983. She was 22 years old. They had consensual sex. One time they were having sex and he "bound" her "with his legs and his arms" so that she could not move. He became "so forceful" that she kept saying " '[y]ou're hurting me' " but he would not stop. She could not pull away from him. Another time she caught Holland "messing around" in the bathroom with his brother's girlfriend. Mary L. tried to get away up the stairs as Holland was pulling her back. She woke up the next day with a bruise of a "complete handprint" on her chest. There was another time in the bathroom at Holland's mother's house that he became angry.

19

He threw her against the wall in the shower.  He choked her and raped her in the anus.  She left afterward.  That was the last time she saw Holland.

Sometime after their relationship ended, Holland called Mary L. at home in the evening.  It was "right around" her birthday and she was going to go out to dinner.  Her birthday is on August 5.  Holland sounded panicked.  He told her that he was in trouble.  He told her that a detective was going to call and that she should " 'tell them that I was with you.' "  She said okay.  A detective called her almost right after, and she told him that Holland was with her.  It was not true.  She does not know why she lied for Holland.  She was afraid of him.

Mary L. agreed on cross-examination that in speaking with the district attorney's investigator in 2007, she only described a single incident of sexual assault by Holland.  She did not remember telling the investigator in 2007 that she never talked to any officer about an alibi.  The first time she mentioned the alibi to the police was in speaking to another district attorney's investigator in January 2015, who "jogged" her memory about the alibi.  She had mentioned the alibi to other people back around that time.  She told the investigator that she was " 'so strung out on methamphetamines back then.' "

Christine H. met Holland around 1993 when she was 23 years old.  Holland was 16 years older than she was.  They began dating soon after.  He was an enjoyable person to be around at first.  They later moved in together.  Holland became controlling and verbally abusive.  Their sexual relationship changed as well.  She was afraid he was going to kill her during sex.  Holland raped her as "a regular occurrence" over several years.  He would put his hands on her throat and take her clothes off, sometimes holding her at knifepoint, and sometimes using foreign objects to penetrate.  Holland was sexually aroused by her fear.  She testified that on a regular basis he would use a forearm or his hands to squeeze her neck while he raped her.  Sometimes she would lose her vision and black out.  There were several times that he pricked the skin on her chest or her neck with a knife, or traced it over her body.  One time he penetrated her with the

20

knife.  He raped her on one occasion using the bristle side of a round hairbrush.  She bled for several days.  Holland also struck her during intercourse, usually open-handed across the face, and once with a closed fist.  She tried to leave him but he would find her and take her back.  She believed that she could not escape him.

Holland told Christine H. that he had raped a girl, and while he was raping her, he strangled her.  She did not remember Holland's exact words, just that "[h]e really liked the idea that he had raped this lady, and while he was raping her, he had stabbed her.  He liked that.  He kind of bragged on that."  They were living in an isolated location at the time on Mt. Hamilton in San Jose.  They both used drugs, including methamphetamine and pills.  She would get her drugs from him.  Once after she tried to leave and he found her, he reminded her that he would do to her what he had done to the girl.  He told her that " 'he really enjoyed fucking her while she died.' "

Christine H. left Holland after three or three and a half years by driving to the home of a family member he did not know.  They had been at Holland's mother's house when Holland heard on the news that the police department had opened a cold case.  After a brief exchange on the record between counsel and the trial court, Christine H. described the moment that Holland "came outside from inside of the apartment and looked really scared and proceeded to tell me that the police had opened up an investigation, re-opened an investigation on two murders. . . ."  Defense counsel objected and moved for a mistrial.  We discuss the motion for mistrial *post*, part III.A.  The trial court ultimately struck the last line of testimony and admonished the jury to disregard it.

Christine H. further testified about an incident in which Holland became angry and stabbed a knife into the wall next to her neck.  He told her, " 'I'll do to you like I did to her.' "  She remembered "looking at him and asking him to do that"—to kill her because she could not get away from him and wanted to end it.  The time that she described at his mother's house in Campbell was close to the end of her relationship with him.  He appeared afraid and was using more drugs than before.  She "waited for [him] to kind

21

of unravel" and used that as a chance to escape. Holland found her some weeks later at her mother's house and began to stalk the house and make threatening phone calls. Christine H. filed a restraining order around that time. That was in 1994.

Christine H. was alone with Holland two times after that. Once she got into his vehicle to get him away from her mother's house. He drove to a deserted street nearby and raped her. Sometime after that she got a second restraining order against him. She eventually told a friend about Holland telling her that he had raped and murdered a girl. She later learned that the friend had known Munoz and about the case against Holland. She spoke with the district attorney's investigator in 2010.

On cross-examination, Christine H. testified that when she met Holland, he was a drug user and on parole. She was a methamphetamine user and snorted "crank." She was an addict before she met him. She did not remember if she ever told the district attorney's investigator that Holland said he had stabbed the girl he claimed to have raped and strangled, though that is what she testified to in her direct examination. She denied finding out only later from some other source that Munoz had been stabbed. She admitted that when Holland once fell into a knife rack and was badly cut and begged for help, she refused. On another occasion, she tried to kill herself by taking barbiturates and whiskey. She woke up bleeding from a burst ovarian cyst. She wanted to die but Holland took her to the hospital, saving her life.

Christine H. acknowledged that she never reported Holland's alleged rapes and abuse or that he had confessed to a murder. When he was arrested for a drunk driving incident, she did not tell the police that he had been raping her or that he told her he had killed a girl. Nor did she contact his parole officer to report him while they were together. She never went to the hospital for any injuries that he caused. She also never reported being raped in the restraining order applications that she filled out.

The first restraining order application, filed in March 1994, described an incident in December 1993 in which Holland hit her with a closed fist to the face, threw her down,

22

kicked her repeatedly in the ribs, and began to strangle her. Christine H. wrote on the application that this happened at a park in San Jose, and that the police arrived just as she began to black out. She claimed to have suffered several cracked ribs, a black eye and bruises, and prominent strangulation marks on her throat and neck. The second application was filed later in September 1994. In it, she described the prior incident and declared that the police had taken an incident report.

Christine H. denied that she made up talking to the police after the incident described in the restraining order. She admitted that she suffers from dissociative identity disorder, which used to be known as multiple personality disorder. She testified on redirect examination that speaking with the district attorney's investigator in 2010 was the first time she had talked about the sexual abuse by Holland. She did not intentionally leave anything out. She never reported it before because she did not have the reassurance that he would be locked up and she thought he would kill her or her family members. She has lived with her mental health conditions for some time and goes to therapy for treatment. Sometimes she disassociates certain memories or events; in therapy they "put it all back together." She did not imagine or make up anything that she testified to in court.

Debra W. was 34 years old in July 1985. She had separated from her husband and was living in her car in a park parking lot. She had just started a job a week before and was trying to get back on her feet. She was sitting at a picnic table one afternoon when a man named Chris struck up a conversation. They chatted and made plans to meet again. The next day they met at 5:00 p.m. after she finished work. They walked and stopped at two bars where they drank beer and talked. It was getting late and was dark outside. She told him that he could walk her to the park and that she would go home from there. They walked for a bit on the grass and she thought they were going to say goodnight. Instead, he ordered her to take her pants off and to lie down. He was holding a knife at his side. It had a silver blade and brown handle, like a hunting knife. She felt scared and

complied. He pulled his pants down and raped her. It was "very fast." After he got up, he walked past her and seemed to be talking to himself, his face "straight ahead." He cursed and said " 'I did it again.' "

Debra W. ran to a phone booth at the end of the park and called the police who responded quickly. She gave a detailed description but declined a medical examination because she was afraid it would make her late for her new job. A few days later, detectives showed her a photo lineup. She remembered being shown a book of at least 50 photos. She reviewed the photos and identified one as her assailant. She was 98 percent confident in her identification. Debra W. told the district attorney's investigator in 2007 that before he raped her, the rapist put the knife up to her neck.

Debra W. admitted on cross-examination that she lied to the police at the time about where she was living. She did not remember other details that she had told the police. She agreed that her memory of what happened was better in 1985. She did not remember telling the police that as the man walked away from her he said " 'I'm really blowing it' " rather than " 'I'm doing it again.' " She denied that she had traded oral sex for drugs with the man and denied any sexual contact with him until he raped her.

### E. Defense Witnesses

The trial court read certain evidence into the record at the beginning of the defense's case, as agreed by the parties.

This evidence included that Wortman, who died before the trial, told investigating officers that he, Mendes, and Stacy returned to his house at approximately 2:00 a.m. on the morning of August 6 [*sic*][7], 1983. Wortman saw the van parked in the driveway of the Lawsons' home and remarked that Betty was home. Stacy replied, " 'No. It's Cindy,' " referring to Munoz. Mendes said, " 'I'll go check.' " Mendes was gone for 30

---

[7] The record reflects that the date read to the jury was "2:00 a.m. on Sunday morning of August 6, 1983" instead of August 7, 1983.

to 45 minutes while Wortman and Stacy were installing the car stereo. Wortman did not see where he went. Earlier on Saturday night, August 6, 1983, Wortman had helped Mendes tow a car to their street in Campbell. A few days later, on August 10, Wortman and his mother found a large serrated kitchen knife on the backseat of the car under a black Velcro-type shirt. Campbell police inventoried the shirt and knife. A piece of wire fell out of the black Velcro-type shirt when a deputy district attorney and deputy public defender examined the shirt in July 2009.

The parties also entered various stipulations, including the following. First, during her interview with the district attorney's investigator in 2007, Mary L. did not recall Holland asking her to provide an alibi for him and she did not recall speaking to any police officer about Holland. Second, Mendes told Sergeant Dippell during his interview on August 14, 1983, that he, Wortman, and Stacy stopped and bought beer at the 7-Eleven on their way back to Wortman's house from their unsuccessful attempt to look for the party at the Lexington Reservoir. Third, when Prater spoke with the detective on August 7, 1983, he told him that the white 10-speed bicycle was in front of the house when they pulled up and that he did not know who the bike belonged to. Fourth, the knife found in the car tested negative for the presence of blood.

The testimony of the defense's forensic expert is summarized *ante*, part II.C.

Other defense witnesses testified about incriminating statements made by Mendes, and about issues connected to police records and latent fingerprints.

Benjamin Mathews lived in Campbell in August 1983. Mathews knew Mendes from the neighborhood. He saw Mendes on August 8, 1983, one night after the homicide. They were at Joe Reed's trailer in Campbell. Mathews heard Mendes say, under his breath, that he "shouldn't have killed that girl." He was "kind of mumbling to himself . . . and then he stated, 'I shouldn't have said that. That wasn't nice.' " Mathews did not know if Mendes was under the influence of drugs or intoxicated at the time.

25

Brenda Kaler lived in Campbell in August 1983 with her boyfriend Joe Reed. She saw Mendes the evening after the murder. Mendes was at their trailer. He often hung out there. Mendes was wearing a t-shirt, and both his arms were scratched like he had been clawed. Mendes told her he had fallen off his bicycle. She pointed out that his scratches did not look like road rash. He answered, saying, " 'I don't know if I did that last night, that murder or not. I don't remember what I done.' " Mendes asked Kaler if she thought he killed that girl. She told him that she had no idea, and "[h]e said he didn't know either. He couldn't remember if he did it or not." She did not call the police or talk to an investigator about Mendes's statements until speaking with the district attorney's investigator in 2007.

Robert Prater, Sr., is the father of Robert Prater. On the day of the murder, he accompanied his son and David Lawson to the police station. He returned home afterwards with his son. At no time that day did he see Mendes or anyone come to the house and say anything about having raped or murdered Munoz. He would have called the police if he had heard that. He remembered being around the house that day but agreed on cross-examination that he was not guarding his son the entire time. But he was "[e]xtremely confident" that nobody came to the house that day or told Prater, in his presence, that they had raped and killed Munoz.

A supervisor for San Jose police records, Penny Lee, conducted a records database search for Christine H. She found no hits from 1983 to the present of any police reports or field contacts. Lee testified that the database records when an officer stops someone in the field but acknowledged on cross-examination that she did not know whether older information before the system went online in 2001 was complete. She agreed on redirect that earlier records were migrated to the database, and that if a police officer recorded a field contact involving Christine H. in 1993 or 1994, it would be in the database unless the officer did not turn it in.

26

Two latent print examiners for the San Jose Police Department testified as experts in fingerprint analysis, evaluation, and comparison. From among the latent prints lifted and photographed from the crime scene, there was one usable fingerprint on the white 10-speed bicycle found in front of the Lawsons' house and one usable palm print on the window sill of the bedroom where Munoz's body was found. The fingerprint was compared in April 1984 against a fingerprint card for Holland and revealed no match. Latent print examiner Eva Chun manually compared the prints to the fingerprint records of Holland, as well as to those of Brian Mendes, David Lawson, Scott Wortman, and Robert Prater, Jr. The prints did not match those of Holland or Mendes or the other individuals. Chun testified in rebuttal testimony that a finding that the latent print does not match the submitted comparison—called a non-identification—is not the same as a person being excluded as a possible source of the latent print.

Other defense witnesses included the adult son of Holland and Dolores H., who testified that in his opinion his mother is not an honest person. He testified that Dolores H. had told him that Holland hurt her "[m]entally" by lying and by cheating on her but never mentioned physical violence, and that when he observed violence between his parents, his mother was "[d]efinitely" the aggressor. When he spoke with his mom after Holland was arrested in this case, she told him that she had talked to the police and had "said things that she wishes she hadn't said."

A former friend of Holland and his siblings testified that she had sex with Holland a few times in 1982 or 1983, and again in 1988 or 1989. It was "nice" sex, not violent or forceful. He did not choke her.

A rancher who hired Christine H. and Holland in 1993 as employees on her horse ranch testified that she fired Christine H. after about two months because Christine H. had been drinking while taking care of the rancher's infant daughter. She never noticed injuries on Christine H. or indications of violence during the time that Holland and Christine H. worked there.

27

## III.  DISCUSSION

Holland contends that the murder conviction must be reversed for abuse of discretion because the trial court (1) erroneously denied his motion for a mistrial after Christine H.'s testimony and the related exchange between attorneys conveyed to the jury that Holland had admitted committing two additional murders, and (2) erroneously excluded Mendes's statement in front of a group of people in which he described strangling a girl.  Holland contends that both errors violated his state and federal due process rights to a fair trial.  (Cal. Const., art. I, § 15; U.S. Const., 14th Amend.)

### A.  Denial of Mistrial Motion

Holland contends that Christine H.'s testimony about Holland's reaction to news that police were investigating a cold case violated his state and federal constitutional rights to a fair trial when she improperly referred to "two murders" in violation of the court's pretrial order.  He contends that the trial court abused its discretion in denying his motion for mistrial.  We find no abuse of discretion.

#### 1.  *Factual and Procedural Background*

Christine H. told an investigator in 2011 that when Holland felt a need to control her, he would tell her that he would do to her "what he had done to the others, meaning '[k]illed em.' "  Christine H. said that Holland "had killed this girl, never told me her name, never gave me a lot of detail ah—except that he had strangled her" and "he really enjoyed fucking her while she died."  Christine H. understood that was what Holland would do to her if she tried to leave him.  She described a time when she and Holland were at his mother's apartment.  Holland came outside "scared" and said he was in trouble because he had seen on television that they had opened a cold murder case, and that he had done it and had to leave.  He told Christine H. "about two other girls" he had killed, dismembered, and put in suitcases in the Santa Cruz mountains.

28

The defense argued to the judge that any reference to Holland killing more than one person would introduce inadmissible character evidence based on other criminal acts, prohibited by Evidence Code section 1101, subdivision (a) and would violate Holland's due process right to a fair trial. The prosecutor offered to admonish Christine H. to refer only to the single cold case. The trial court ruled that it would allow the testimony over the defense's objection and instructed the prosecutor to direct the witness to refer to the singular and "not use the term 'others' but 'other.' "

During Christine H.'s testimony at trial, the prosecutor asked whether something had happened before she got away from Holland. She responded that "[a] subject had come up on the news station." After an unreported discussion at the bench, the trial court announced that it was overruling the defense's objection and the direct examination could continue. Christine H. testified that Holland told her "that the police department had opened a cold case." Defense counsel interjected to ask for a limiting instruction that the statement was "not being offered for the truth of the matter" to which the prosecutor responded, "It's admission from the defendant, which qualifies." The trial court refused the defense's request for a limiting instruction as to Holland's statements. The prosecutor continued with the direct examination and asked Christine H. what Holland said after seeing something on television at his mom's apartment. She answered, "The defendant came outside from inside of the apartment and looked really scared and proceeded to tell me that the police had opened up an investigation, re-opened an investigation on two murders." Defense counsel immediately objected and moved for a mistrial.

Outside the presence of the jury, defense counsel argued that based on what Christine H. had told the investigator previously, the prosecutor knew his questions would elicit testimony about two murders yet he "insisted on going there . . . ." Defense counsel argued that not only was the statement hearsay but it was not relevant because it implicated a different murder than the murder being charged. Counsel argued that the jury would know Christine H. was describing a different murder because criminalist

29

Lynne Burley had already testified that the case was inactive during that time period in the 1990s. He emphasized that there was no evidence of television coverage at the time and argued that the prosecutor's comment on the record calling Holland's statement an "admission" magnified the prejudicial effect of the testimony. Defense counsel further argued that it was impossible for the defense to impeach the misleading testimony without confronting Christine H. with the transcript of her interview to show that her statement to the investigator about Holland killing and dismembering two girls was a fabrication. He argued that the impossibility of cross-examining Christine H. on her statement illustrated the gravity of the error and effectively denied Holland his rights of due process and confrontation.

The trial court explained that it would strike Christine H.'s answer and admonish the jury to disregard it. It would deny the motion for mistrial and permit the prosecutor to ask a leading question and extract the admissible testimony from Christine H.—that Holland had come to her scared after hearing on the news that a cold case had been reopened. Defense counsel asked for "the specific admonition that there is no evidence to support the witness's claim about what was on the news." The trial court declined, saying that it believed the remedy of striking the testimony and admonishing the jury was "more than sufficient" and in fact penalized the prosecution by not allowing the admission in evidence.

After a break, the prosecutor said that he had decided not to ask the leading question and to move away from the topic because he did not believe it was "that critical" to the prosecution's case. When the jury returned, the trial court explained that it was going to strike "the answer to the last question" and admonished the jury "to disregard that response." It reminded the jury that what the lawyers say in the courtroom is "not evidence" and that it should disregard any attorney arguments or objections. The prosecutor resumed questioning Christine H. on points related to Holland's threat to do

the same to her as he did to the other girl and to how his behavior changed toward the end of their relationship, allowing her to get away from him.

### 2. *Applicable Law and Standard of Review*

"To require the grant of a mistrial motion, the risk of prejudice must be incurable by admonition or instruction." (*People v. Elliott* (2012) 53 Cal.4th 535, 575 (*Elliott*).) That is, "[a] trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation] . . . ." (*People v. Avila* (2006) 38 Cal.4th 491, 573.) "Because the trial court is generally better able than an appellate court to make this determination, a ruling denying a motion for mistrial is reviewed under the deferential abuse of discretion standard." (*Elliott*, *supra*, at p. 575; accord *People v. Valdez* (2004) 32 Cal.4th 73, 128; *People v. Montes* (2014) 58 Cal.4th 809, 884.)

### 3. *The Trial Court Did Not Abuse its Discretion in Denying the Mistrial Motion After Christine H. Described Holland's Reaction to News of Reopened Investigations into "Two Murders"*

#### a. *The Trial Court's Admonition to Disregard the Stricken Testimony Was Adequate Under the Circumstances*

Holland contends that Christine H.'s testimony about his reaction to news that police had reopened the investigation into two murders was incurably prejudicial. He argues that the general presumption that jurors follow a trial court's admonition to ignore inadmissible evidence does not apply where, as here, the circumstances point to inherently prejudicial evidence that the jury would not be able to ignore. The People respond that the trial court's admonition was enough to cure the inadmissible reference to two murders, especially because the reference was brief and isolated, had ambiguous meaning, and was not the product of deliberate witness or prosecutorial misconduct.

Holland acknowledges as a starting point that appellate courts normally presume that jurors follow the trial court's instructions to ignore inadmissible evidence. (*People v.*

*Letner and Tobin* (2010) 50 Cal.4th 99, 196.)  But he emphasizes the practical limits to an admonition when the jury receives highly prejudicial information and contends that Christine H.'s volunteered testimony falls within the exception.  In his view, the jury could not realistically ignore evidence that was tantamount to Holland confessing involvement in two unrelated murders, especially after the jury heard the prosecutor characterize the hearsay statement as an "admission."

We recognize that in some circumstances it is unrealistic for a jury to disregard emotionally powerful evidence.  That is indeed why the rules of evidence preclude, with distinct exceptions, evidence of uncharged crimes to show bad character or criminal disposition.  (Evid. Code, § 1101; *People v. Alcala* (1984) 36 Cal.3d 604, 630-631 [abrogated by statute as applied to uncharged sexual offenses].)  The court in *Alcala* explained that evidence of criminal propensity "tempts 'the tribunal . . . to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.' " (*Alcala*, *supra*, at p. 631.)  The California Supreme Court has reiterated many times that courts should scrutinize other crimes evidence for admissibility because of its inflammatory and highly prejudicial impact.  (See, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 748; *People v. Daniels* (1991) 52 Cal.3d 815, 856.)

As Holland points out, the prejudicial impact of an improperly admitted confession—which he contends effectively occurred here—may be even more pronounced.  A defendant's confession " 'is probably the most probative and damaging evidence that can be admitted against him. . . .' " (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.)  Coming from the accused, confessions have a " 'profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.' " (*Ibid.*)  Confessions are " 'a kind of evidentiary bombshell which shatters the defense' " (*People v. Cahill* (1993) 5 Cal.4th 478, 503 (*Cahill*)) and are

"more likely to affect the outcome of a trial than are other categories of evidence" (*ibid*.) when erroneously admitted. Though "likely to be prejudicial in many cases" (*ibid*.), the California Supreme Court has suggested circumstances in which "[t]he erroneous admission of an involuntary confession might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime . . . ." (*Cahill*, *supra*, at p. 505; accord *People v. Neal* (2003) 31 Cal.4th 63, 86.)

Holland argues that the extreme character of the examples enumerated in *Cahill* underscores the profound prejudice resulting from the erroneous admission of a confession. He claims that Christine H.'s testimony implying Holland's involvement in "two murders" was tantamount to a confession that he committed two murders unrelated to Munoz, making it impossible for the jury to follow the trial court's curative instruction. The issue, on review of a motion for mistrial, is whether the testimony was "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) We are not convinced that Christine H.'s testimony *was* tantamount to an improperly admitted confession *or* that her unsolicited reference to "two murders" was incurably prejudicial when viewed in context of the entire record.

First, we find the challenged testimony cannot be reasonably construed as relaying a confession within the meaning of the above-cited cases. The power of a confession is that it constitutes " 'persuasive evidence of guilt' " (*Cahill*, *supra*, 5 Cal.4th at p. 503) from the defendant himself or herself. While there may be circumstances in which improper witness testimony points so directly to a confession by the defendant in the crime charged that the resulting prejudice in incurable, as happened in *People v. Navarrete* (2010) 181 Cal.App.4th 828 (*Navarrete*), we do not believe such incurable

prejudice can be found here. In *Navarrete*, the defendant moved pretrial to suppress a statement he made to detectives after his arrest on charges of lewd conduct on a child. (*Id*. at pp. 830-831.) The trial court granted the motion and excluded the defendant's statement at trial. (*Id*. at p. 831.) But the detective—rankled by the trial court's ruling—referenced the defendant's statement in explaining why he chose not to conduct DNA testing, saying " 'it's a court rule that the defendant's statement is inadmissible. So I can't state the . . . reason.' " (*Ibid*.)

Although the trial court struck the detective's testimony and issued curative instructions, the Court of Appeal reversed the judgment of conviction because the detective's improper testimony likely led the jury to believe the defendant had confessed. (*Navarrete*, *supra*, 181 Cal.App.4th at p. 834.) The Court of Appeal acknowledged that "[a] witness's ambiguous and inadvertent reference to a defendant's out-of-court statement previously excluded by the court may not always require the granting of a mistrial." (*Id*. at p. 836.) But the detective's testimony in *Navarrete* was "neither ambiguous nor inadvertent." (*Ibid*.) The Court of Appeal found that the most reasonable inference for the jury to draw from the detective's deliberately suggestive testimony was that the defendant had confessed or otherwise incriminated himself—otherwise, the detective would have tested the swabs for DNA to try to build a case against the defendant. (*Id*. at p. 834.) Because the Court of Appeal believed the detective's misconduct "more likely than not achieved the" desired effect to prejudice the jury against the defendant (*id*. at p. 836), the Court of Appeal reversed the judgment and remanded for a new trial. (*Id*. at p. 838.)

Christine H.'s reference to the excluded statement about "two murders" did not imply a confession to the crime charged. In contrast with the detective's willful effort in *Navarrete* to assure the jury that the detective had reason to forego DNA testing despite the "less than airtight case" against the defendant (*Navarrete*, *supra*, 181 Cal.App.4th at p. 834), the record here supports the trial court's observation that the witness's reference

34

to two murders—despite the admonishment she received before testifying—was inadvertent and did not support the inference that Holland admitted to committing the murders. There was no evidence before the jury to suggest that Holland took responsibility for those crimes or was even familiar with them.

Holland argues that the jury would have known the news coverage that prompted Holland's statement to Christine H. was not about the Munoz murder—and so must have related to some other unsolved murders—since the case was inactive during that period. The prosecution strongly disputed that point at trial due to community interest in and newspaper coverage of the Munoz case around that time. But even if we assume Holland's point to be true for purposes of our analysis, the jury had no basis to make the inferential leap between Holland's statement and a confession of guilt to two murders unrelated to Munoz. Nor does the prosecutor's characterization of Holland's out-of-court statements as an "admission" plug the gap. The prosecutor used the word "admission" during an exchange between counsel about the defense's request for a limiting instruction, all of which preceded the challenged testimony. It would be a stretch to presume that the jury not only applied counsel's comment to Christine H.'s subsequent testimony, but in doing so ignored the trial court's repeated admonition to disregard attorney arguments, since what the lawyers say in the courtroom is "not evidence."

We find the more likely inference from Christine H.'s reference to a reopened "investigation on two murders" was that hearing about the reinvestigation of old murder cases—whether understood to be of the Munoz murder or of other unsolved murders—made Holland afraid. This inference differs little, if at all, from the inference the jury likely would have drawn from the testimony originally delimited by the pretrial ruling, which allowed Christine H. to describe Holland's fearful reaction to the reopening of a cold case (singular). Put differently, without follow-up testimony that Holland "said he had done it" as Christine H. relayed during her interview with the investigator, the jury could not reasonably construe Holland's response to the news story as a confession to

35

those crimes because it did not provide *persuasive evidence of guilt* as from a confession. (*Cahill*, *supra*, 5 Cal.4th at p. 503.)  At most, the evidence that Holland feared the reopened investigation into *two murders*, when the jury knew only that he had been charged with *one murder* that was not yet being reinvestigated, would have supported a general inference of guilty conscience in the Munoz case and fear that it too could be reopened.  This inference was reinforced by Christine H.'s other testimony that Holland repeatedly reminded her that he had raped and strangled a girl.  Under these circumstances, the trial court's admonition for the jury to disregard the stricken testimony was enough to correct course.

### b. *The Defense Cannot Demonstrate Incurable Risk of Prejudice*

To the extent that the jury might nevertheless have retained some notion that Holland feared the reinvestigation into two *other* murders he had committed, we assess prejudice for purposes of the mistrial motion under the rubric of improper other crimes evidence.

As noted at the outset, the prejudicial power of other crimes evidence is well established and subject to strict limitations on admissibility.  The California Supreme Court in *People v. Dement* (2011) 53 Cal.4th 1 (*Dement*), overruled on another point in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216, acknowledged the possibility that a witness's volunteered statement can provide the basis for a finding of incurable prejudice. (*Dement*, *supra*, at p. 40.)  But the few cases that reflect that outcome bear little resemblance to the circumstances here.

One example, cited by Holland, is *People v. Bentley* (1955) 131 Cal.App.2d 687 (*Bentley*), disapproved on another point by *People v. White* (1958) 50 Cal.2d 428, 430. The appellate court in *Bentley* reversed the defendant's judgment of conviction for lewd conduct on a child after finding the trial court's curative admonishment was inadequate to address prejudice caused by witness testimony suggesting the defendant had engaged in

prior similar conduct. (*Bentley*, *supra*, at pp. 688, 691-692.) At trial, a police officer testified that after questioning the defendant about the alleged molestation (which the defendant denied), the officer " 'went on to question [the defendant] about activities he had been involved in in 1942 when he had been a suspect in another case, and [the defendant] denied this.' " (*Id*. at p. 689.) The trial court struck the testimony and admonished the jury to disregard it, but declined to grant a mistrial. (*Ibid*.) The appellate court deemed the admonishment ineffective. It found that the "mere direction that the testimony should be disregarded was no antidote for the poison that had been injected into the minds of the jurors" (*id*. at p. 690) because the defendant "stood as one who had been accused of some other sex offense" (*ibid.*). The court noted that the statement effectively put the defendant in the position of defending himself against other similar misconduct. (*Id*. at p. 691.) Taken together with another error that reinforced the jury's likelihood to improperly consider the defendant's prior arrests, the court concluded that the defendant had not had a fair trial. (*Id*. at pp. 691-692.)

Holland asserts that Christine H.'s testimony was at least as impactful and prejudicial as the testimony of the police officer in *Bentley*. He argues that like the accusation of child molestation, an accusation of multiple murders arouses a "feeling of revulsion" (*Bentley*, *supra*, 131 Cal.App.2d at p. 691) and a strong emotional response that cannot be dispelled. Holland points to the result in *People v. Guizar* (1986) 180 Cal.App.3d 487 (*Guizar*), in which a witness volunteered information suggesting the defendant was a multiple murderer. The appellate court reversed the first-degree murder conviction for ineffective assistance of counsel because the defense counsel had failed to object to the admission of a recorded statement in which an eyewitness told police that he had heard someone say the defendant "had 'committed some murders before.' " (*Id*. p. 490.) Though the trial judge instructed the jury that the statement was admissible only to establish the witness's state of mind at the time he spoke to the police (*ibid*.), the Court of Appeal held that the statement should have been excluded. (*Id*. at p. 491.) The court

37

found the evidence of "unproved serious offenses . . . had little, if any, relevance to the issues presented" (*ibid*.) and "plainly could have had a prejudicial effect on the jury's consideration of the degree of responsibility" (*id*. at pp. 491-492) for the victim's death.

We find neither *Bentley* nor *Guizar* particularly informative here. *Guizar* is largely inapposite. The issue there was ineffective assistance of counsel, not a motion for mistrial, and the witness stated directly that he heard the defendant had committed some murders before. (*Guizar*, *supra*, 180 Cal.App.3d at p. 490.) Christine H., as discussed above, never testified that Holland had committed the two murders, only that he was "really scared" when he saw news of the police reopening an investigation. The prejudice analysis in *Guizar* moreover rested heavily on the facts of that case, which included some evidence supporting the defendant's claim of imperfect self-defense and made it "reasonably probable that a jury whose deliberations were not tainted by speculation about whether [the defendant] had, in fact, committed prior murders could have found [him] guilty of less than first degree murder." (*Id*. at p. 492.)

*Bentley* addressed the denial of a motion for mistrial, but the similarities end there. The current standard of review of a mistrial motion is abuse of discretion, yet it is unclear what standard the court in *Bentley* applied. The decision also predated statutory changes making prior uncharged sexual offenses admissible under Evidence Code section 1108, subject to an Evidence Code section 352 balancing analysis. The changes in the law cast doubt on the usefulness of the prejudice analysis in *Bentley*, since the court relied substantially on the pernicious effect of sex offense evidence to conclude that the defendant did not have a fair trial. (*Bentley*, *supra*, 131 Cal.App.2d at pp. 690-691.) Notably, the offending testimony in *Bentley*, like that in *Navarrete* discussed above, involved an intentional effort by a law enforcement witness to put prejudicial information about the defendant before the jury. The court stated that it was "obvious from the record that the police officer deliberately made the statement about [the] defendant being a

38

suspect in another case . . . with the idea in mind of prejudicing [the] defendant." (*Id*. at p. 690.)

Christine H.'s testimony lacked any calculated overlay, as compared with testimony suffused with innuendo like in *Navarrete* and *Bentley*. It was also an isolated reference amidst what can only be described as extensive, damaging testimony about Holland's sexual violence toward her and other young women. Holland disputes that the brevity of the reference mattered, arguing that it did not diminish the exceedingly prejudicial implication that Holland was involved in two other murders.

The record does not bear his argument out. This was not a case in which the stricken information was likely to stand out or dominate in the minds of the jurors when viewed against the entire record of admissible evidence.

The sperm found in Munoz's vagina and on her pubic hair clippings indisputably came from Holland. The forensic experts agreed that while they could not "timestamp" when the sperm was deposited, they could identify the most likely time frame based on the plus-three concentration of sperm and the presence of intact sperm tails. Criminalist Kristin Cardosa testified that it would be less likely to find the plus-three sperm concentration in pubic hair clippings six to 12 hours after sex if the victim had engaged in daily normal activities, and would be more likely if the victim was killed shortly after intercourse. Criminalist Lynne Burley testified that a rating of plus-three indicated a "fairly recent" deposit, even considering that men have varying sperm counts, and that finding sperm with tails also indicated recency because tails are "fragile" and "typically fall off very shortly after intercourse." She opined that in a hypothetical where a victim was murdered at about 3:00 a.m. and the autopsy was performed nine hours later, a vaginal sample showing intact sperm cells would suggest the victim "had intercourse before she passed" and would be consistent with the opinion that the intercourse occurred at or near the time of death. Burley testified that it was "also a possibility" in the given hypothetical that the victim had intercourse several hours before death.

39

Holland contends that the testimony of these experts is consistent with the defense's theory that Holland and Munoz had consensual sex earlier in the time frame, well before Munoz's murder around 3:00 a.m. His point is overstated. The experts acknowledged that it was possible the sperm samples could have resulted from intercourse up to several hours before Munoz was killed. But they emphasized that their findings were more consistent with sex nearer to the time of death. As Burley reiterated in her rebuttal testimony, a time frame of "less than 12 hours" is "most common for the sperm rating and the spermatozoa with intact tails . . . ." She agreed that findings of plus-three concentration with some tails was "possible" up to 24 hours after intercourse but opined that it would be "significantly more common" to see that rating at around 12 hours.

While the 12-hour window could be consistent with the defense's theory that Munoz and Holland had sex after she left the hospital and before she returned home to her death, nothing in the record supported that claim. Multiple witnesses testified that Munoz was deeply committed to Jamie and was not in a relationship with anyone else. Munoz spent most of the days and nights preceding her murder at the hospital with Jamie. According to Munoz's best friend, she and Munoz knew Holland peripherally through the neighborhood and agreed that he was "creepy." The defense's attempt to theorize that Munoz could have left the hospital to have consensual intercourse with Holland in the hours before she was killed appears farfetched and speculative.

Moreover, the evidence of Munoz's injuries, her cause of death, and the position and appearance of her body when discovered, together pointed to a sexual assault concurrent with the murder. Munoz suffered a blunt force trauma to her face and eight superficial stab wounds to her chest and neck area—shallow enough not to kill but which resulted in significant blood loss. She was manually strangled. Deputy medical examiner O'Hara testified that it is standard for forensic pathologists to examine for evidence of sexual assault when a victim has been strangled. Robert Prater, Jr., testified

that Munoz was splayed naked on the bed with her shirt pulled up over her breasts, "spread eagle" as though someone had just been having sexual intercourse with her. Prater admitted that he was "extremely high" that night but testified unequivocally that seeing Munoz like that was "pretty traumatic" and was "kind of drilled into the head . . . into the eyes . . . ."

The propensity evidence further supported the prosecution's case. Dolores H., Mary L., Christine H., and Debra W. each testified that Holland had raped them. Dolores H. described Holland becoming violent when she resisted having sex, saying that he squeezed her neck and choked her "[m]any times." Mary L. said that Holland once "bound" her with his legs and his arms during sex so she could not move even though she told him to stop because he was hurting her. She described another time when Holland choked her and anally raped her in the shower. Christine H. testified that Holland raped her as "a regular occurrence" during their relationship and said she was afraid he was going to kill her during sex. Holland would use a forearm or his hands to squeeze her neck while he raped her. There were times that he used a knife and pricked the skin on her chest and neck. He told her that he had raped and strangled a girl and that " 'he really enjoyed fucking her while she died.' " Debra W. also testified that Holland, based on her photo lineup identification, held a knife to her neck before raping her in the park. She testified that after he finished he cursed and muttered " 'I did it again.' " Closer in time to the event she had told police that what he said was, " 'I'm really blowing it.' "

Holland's contention that this admissible evidence of guilt was "not overwhelming" (*Navarrete*, *supra*, 181 Cal.App.4th at p. 834) is not convincing on this record. It is true that there were many inconsistencies in the testimony of prosecution witnesses like Prater and Stacy. Holland also disputes the significance of the forensic evidence regarding the time of sex, arguing as noted above that the expert testimony equally supported the defense's theory of consensual sex hours before Munoz's death. And he contends that the remaining forensic evidence supported the defense's theory,

41

because Holland was excluded from the useable latent prints found on the windowsill and the bicycle, and because Holland's DNA was not found under Munoz's fingernails. Holland also raises doubts about the credibility and motive of the women who testified that Holland had raped them. He notes, for example, that despite many prior contacts with law enforcement, including the two restraining orders filed in 1994, Christine H. did not report Holland's alleged sexual assaults and rapes until 2010 when she learned that he had been arrested for murder. Holland contends that Christine H.'s failure to inform law enforcement before 2010 of his purported admission to raping and killing a girl, even though she knew that he was on parole, further undermines her credibility. He argues the same is true for her trial testimony that he said he had raped and strangled and *stabbed* a girl, when in her recorded interview several years earlier she said only that he had raped and strangled a girl. Holland points to similar credibility problems with the testimony of Dolores H., Mary L., and Debra W., all of whom he contends were impeached with prior inconsistent statements, contrary evidence, or evidence of motive to fabricate.

There is no question that certain percipient witnesses struggled to recall details or testified to different details than they reported in police interviews after the murder or in later interviews with the district attorney's investigator. Some testified to facts at trial that were not reflected in their prior statements, like Christine H.'s testimony that Holland said he raped, strangled, and stabbed a girl. The inconsistencies and contradictions that Holland relies on, however, did not substantially diminish the sheer scope of admissible evidence of guilt. The DNA evidence identifying Holland as the donor of the sperm found in the vaginal and pubic hair samples, together with the testimony about Munoz's devotion at the time to her boyfriend, the crime scene evidence suggesting that the murder occurred together with a sexual assault, and the testimony of witnesses pursuant to Evidence Code section 1108—which if believed was probative of Holland's predisposition to commit sex offenses that sometimes involved manual choking or a knife, belies Holland's contention that the admissible evidence of guilt was

42

"not overwhelming." (*Navarrete*, *supra*, 181 Cal.App.4th at p. 834.) Nor does the evidence suggesting that Mendes could have killed Munoz, which Holland summarizes in detail,[8] change our analysis.

The breadth and volume of admissible evidence to support a conviction distinguishes this case from those that Holland cites as support for the proposition that the improper testimony was incurably prejudicial. In *People v. Antick* (1975) 15 Cal.3d 79, superseded on other grounds by constitutional amendment and overruled on another ground in *People v. McCoy* (2001) 25 Cal.4th 1111, 1123, the California Supreme Court reversed the judgment in a murder and theft case. The court found in pertinent part that it was highly probable the jury had failed to adhere to limiting instructions in considering prior crimes evidence where the facts presented a close case with limited direct and circumstantial evidence linking the defendant to the crimes. (*Antick*, *supra*, at p. 98.) Similarly in *People v. Fritz* (2007) 153 Cal.App.4th 949, the appellate court rejected the adequacy of a limiting instruction after concluding that the trial court prejudicially erred in admitting evidence establishing that the defendant—who was charged with property theft—had lied about prior shoplifting offenses. (*Id.* at pp. 952-953.) Like in *Antick*, the

_____

[8] There was substantial third party culpability evidence, which Holland summarizes in detail here and which we address directly in considering the implications of the trial court's exclusionary ruling, *post*, part III.B. Some of these points include that Mendes was gone for up to 45 minutes while Stacy and Wortman worked on the car stereo, and that Stacy told police that when he showed up again he came from around a camper closer to the Lawsons' house, which she thought was "strange." Holland also points to Mendes's incriminating statements in the days following Munoz's murder, none of which implicated Holland (except for Prater's disputed statement to the investigator about Mendes's sudden appearance at his house) but which showed that Mendes seemed to consider it at least possible that he had done it. Various other details supported the circumstantial case for Mendes's involvement in the murder, including the scratches on his arm that Brenda Kaler testified looked like "scratch marks from a fingernail," the fact that he had cash to buy ice cream and beer on the way to the beach when he had not had cash earlier that evening, and his possession of jewelry and pills after the murder that had been taken from the Lawsons' house.

43

court in *Fritz* ascribed "immense prejudicial weight" to the jury knowing the defendant had been caught before (*id*. at p. 961) and concluded that the paucity of direct evidence to support a conviction (*id*. at p. 962) made for a "wire-thin" (*id*. at p. 963) case that was unlikely to succeed without the erroneously admitted shoplifting history (*id*. at p. 964).

The court in *Fritz* observed that "while we do presume the jury has endeavored to follow the court's instructions (*People v. Cunningham* (2001) 25 Cal.4th 926), we cannot always assume that those instructions are sufficient to dispel the taint of prejudicial information. A limiting instruction warning jurors they should not think about the elephant in the room is not the same thing as having no elephant in the room." (*Fritz*, *supra*, 153 Cal.App.4th at p. 962.) The elephant-in-the-room analogy is apt where the inadmissible information looms large, like an oversized specter impermissibly shadowing the jury's consideration of the admissible evidence. Here, however, the extensive, incriminating evidence that preceded and followed Christine H.'s testimony would have muted the reference to "two murders" and rendered any lingering effect far less injurious.

Improper evidence that is brief, isolated, or largely duplicative of evidence properly received by the jury may be addressed by the trial court in a curative order. (See, e.g., *Dement*, *supra*, 53 Cal.4th at p. 40.) The defendant in *Dement* was charged with the first degree murder of a fellow prison inmate. (*Id*. at p. 6.) The trial court denied a motion for mistrial during the guilt phase trial after another inmate testified, contrary to a prior admonishment, that the defendant had boasted about killing his brother. (*Id*. at pp. 37-38.) The trial court admonished the jury in a series of curative instructions to disregard the testimony and treat it as though they had never heard it, prefacing the admonition saying that " 'we were shocked several days ago almost into losing our wits about us when a witness . . . violated a very direct admonition that I had given him . . . .' " (*Id*. at p. 38.)

On appeal, the court found that the trial court did not abuse its discretion in denying the mistrial motion. (*Dement*, *supra*, 53 Cal.4th at p. 40.) It reasoned that the

44

testimony about the defendant bragging about killing his brother "was brief and isolated" and "was largely duplicative of evidence the jury properly received." (*Ibid*.) The duplicative evidence in *Dement* consisted of statements written by the defendant in jailhouse letters ("kites") to another inmate which indicated that the defendant was serving time for a prior murder. (*Id*. at p. 32, fn. 9.) The court reasoned that the jury could "reasonably find" (*id*. at p. 40) that the defendant's statements in his kites indicated that he "had previously killed someone he referred to as his brother, and felt justified in doing so" (*ibid*.). The court also noted that the trial court properly struck the statement and repeatedly admonished the jury to disregard it and to determine guilt for the charged murder "without reference to any of [the] defendant's alleged prior conduct." (*Ibid*.)

Holland argues that *Dement* is distinguishable because of the other evidence admitted at trial that was "largely duplicative" of the inadmissible testimony. Holland's interpretation of the duplicative evidence in that case is telling, because rather than citing the *duplicative* evidence (i.e., jail "kites" written to another inmate admitting a prior killing) he cites other evidence admitted at trial relating to the crime charged (i.e., the defendant's contemporaneous oral statements that he was going to kill the victim, his subsequent oral statements that he had killed the victim, and the jail "kites" admitting to another inmate that he had killed the victim). Indeed, in *Dement* the improper testimony that the defendant had admitted to killing his brother—that is, had confessed to murdering someone other than the victim in the case—was "brief and isolated" (*Dement*, *supra*, 53 Cal.4th at p. 40) in part because it came amidst substantial, admissible evidence of guilt for the crime charged. The same is true in this case, as discussed *ante*. We do not find the absence of truly duplicative evidence here to be determinative, especially considering that the duplicative evidence in the form of jailhouse "kites" in *Dement* was itself subject to a limiting instruction and did not give the jury a carte blanche to rely on the inadmissible testimony. (*Id*. at p. 33 [trial judge admonished jury that it could use the

45

"kites" about the defendant's brother only to give context and meaning to the defendant's written statement about the victim, not as evidence of guilt].)

We draw a similar lesson from *People v. Rose* (1996) 46 Cal.App.4th 257, a child molestation case in which the appellate court rejected the argument that the trial court erred in denying a mistrial motion, because the improper introduction of "a 'whole series of prior acts' " (*id*. at p. 265) of uncharged sexual molestation by the defendant "was no more damaging or prejudicial than . . . permissible testimony" (*ibid*.) by a prosecution witness about the uncharged acts the defendant had committed against her. Moreover, " '[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Avila*, *supra*, 38 Cal.4th at p. 573.) The trial court in this case reasonably exercised its discretion in rejecting the defense's interpretation of the improper testimony and determining that it was "more than sufficient" to strike the testimony and admonish the jury to disregard it.

In sum, we find that the standalone reference to "two murders" was most likely understood in context of Holland's fear that the Munoz murder investigation could be reopened. The trial court properly struck the offending statement and directed the jury to disregard it. We presume the jury followed the trial court's instructions, especially where the record confirms there was no further reference to the subject. (See *People v. Alexander* (2010) 49 Cal.4th 846, 915 [upholding trial court's denial of motion for mistrial after witness referenced a triple murder when asked about a prior offense committed by the defendant, noting that the defendant made "no showing of prejudice beyond his mere assertion that because of the nature of the statement, no juror would be able to follow the admonition to disregard it"].) Even if some jurors understood the stricken testimony to be an indication of Holland's involvement in other murders, it did not irreparably damage Holland's chances of receiving a fair trial (*People v. Avila*, *supra*, 38 Cal.4th at p. 573) when viewed in context of the other evidence presented in the case.

46

We conclude that the trial court did not abuse its discretion in denying the motion for mistrial. It follows that the trial court's decision did not violate Holland's right to due process. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

## B. Exclusion of Third Party Culpability Evidence

Holland contends that the trial court abused its discretion by excluding evidence offered to show that about two years after Munoz was killed, Mendes stood in a room full of people and described strangling a girl to death. He argues that the court's exclusionary ruling prevented him from presenting a complete defense, in violation of his federal constitutional rights of due process and compulsory process. We find that the trial court did not abuse its discretion in determining the statement was inadmissible as evidence of third party culpability. Nor did the exclusion of the statement under California law amount to federal constitutional error.

### 1. *Factual and Procedural Background*

Before trial, the prosecutor filed a motion in limine to exclude certain evidence that the defense might offer to support its theory that Mendes killed Munoz. After considering the issues, the trial court ruled that it would admit Mendes's prior statements against penal interest along with the surrounding circumstances so that the jury could assess the reliability of the statements.

Later, during jury voir dire, the prosecutor gave defense counsel a copy of a recorded interview it had just obtained of a witness named Lonny Nelson. The district attorney's investigator first spoke to Nelson when he was making travel arrangements for Stacy to attend the trial from her residence out of state. Nelson is Stacy's "common law husband." Nelson told the district attorney's investigator that he began dating Stacy about two years after Munoz's murder.

47

In a recorded interview with the investigator, Nelson said that he met Mendes around the time that he began dating Stacy. They were hanging out at a friend's house in a "room full of people" and Mendes said something that "scare[d] the shit out of" Nelson. Nelson told the investigator that he heard Mendes talk "accurately" about strangling a person. According to Nelson, Mendes "didn't say what girl or anything but he just says yeah, when you, when you got them by the neck, and you look them in the eyes, and he saw them eyes turn to blueberries." Nelson did not remember how the conversation started or what else was said. He only remembered Mendes saying "when you grab them around the neck, and you start to squeeze, and you see those eyes turn to blueberries, and then, . . . I don't know, that was about it, then they die or something." Nelson said that Mendes "was talking about a girl when he said choke and you see their eyes turn to blueberries like that."

Nelson remembered it was "dramatic" and made him want to keep away from Mendes. Nelson told himself, "this is not somebody I wanna get to know or be around, cause I mean I could tell this son of a bitch here is telling the truth. . . . [¶] I mean the way he described it like that." When the investigator tried to tell Nelson that he thought Mendes was a "big liar," Nelson responded "I don't. I think he was a killer."

Defense counsel argued that Mendes's description of strangling a girl was admissible as against his penal interest because it implicated him in a serious crime. The defense further argued that it was relevant to Holland's third party culpability defense because Munoz had been strangled. The trial court initially found that the comments were too ambiguous to qualify as a declaration against penal interest and ruled that it should be excluded under Evidence Code section 352 as misleading and confusing to the jury. Defense counsel responded that the incriminating comments were not ambiguous because Mendes explicitly described strangling a girl, and Munoz was 17 when she was murdered. Also, defense counsel argued that Mendes's statements were relevant third party culpability evidence when considered with other incriminating evidence connecting

48

Mendes to the murder. Defense counsel further maintained that Holland had a federal due process right under the Fourteenth Amendment "to present those specific statements because they are relevant, they are critical to the defense. They do have a tendency in logic to lead a jury to conclude that [Mendes] was referring to Cynthia Munoz." At the defense's request, the trial court agreed to listen to the recorded interview and to review the interview transcript.

In ruling on the matter after having listened to the interview, the trial court found that Nelson seemed credible and "was making every effort to give truthful answers to the questions asked." The court recognized that Nelson believed that Mendes was talking about killing and attributed Nelson's understanding to the fact that he was aware at the time of the deaths of both Munoz and Tara Marowski, and he believed Mendes was "dangerous and a killer." The court observed that Mendes never mentioned any specific person who was choked, and never mentioned killing anyone or watching them die. This echoed the court's initial observation that Mendes's statement was "ambiguous, it's vague. There is no admission of a killing . . . ."

The trial court in the end found that while Mendes's statement was "arguably a declaration against interest" when viewed in a vacuum, it did not meet the relevance standard for the exception in the context of the case. The court explained that a "hearsay statement that qualifies as a declaration against interest exception is, nevertheless, inadmissible unless it is relevant to prove or disprove a disputed fact. Here, the disputed fact is who killed Cynthia Munoz." The trial court concluded that nothing in the statement suggested that Mendes had choked or strangled Munoz. This distinguished the proffered evidence from other statements that Mendes had made about Munoz's death and which the court had deemed admissible. The court concluded that "this evidence is more akin to character evidence for violence" than a statement against penal interest. In excluding Mendes's statement, the court implicitly rejected Holland's constitutional argument.

49

## 2. *Applicable Law and Standard of Review*

" '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt . . . must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' " (*Elliott*, *supra*, 53 Cal.4th at p. 580.) "Evidence of a third party's prior crimes is inadmissible to establish the third party's criminal propensity." (*Ibid*., citing Evid. Code, § 1101, subd. (a).) We review a trial court's ruling to exclude third party culpability evidence for abuse of discretion. (*Elliott*, *supra*, at p. 581.)

## 3. *The Trial Court Did Not Abuse Its Discretion In Excluding Mendes's Declaration Against Penal Interest*

Mendes's comments about squeezing the neck until the "eyes turn to blueberries" needed to qualify under an exception to the hearsay rule and as relevant third party culpability evidence in order to be admitted at trial. It is difficult to ascertain from the record of Nelson's interview whether he heard one statement or a series of statements from Mendes that day. For simplicity, we refer to Mendes's statement as a single reference, though we recognize that Nelson may have been describing several statements. We also recognize that Mendes made other incriminating statements after the murder, which were admitted at trial as discussed *ante* and are not directly at issue here.

### a. *Mendes's Statement Was a Declaration Against Penal Interest*

Hearsay, defined in California as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" is inadmissible except as provided by law. (Evid. Code, § 1200, subd. (a); *id*., subd. (b).) The exception for a declaration against penal interest provides that "[e]vidence of a statement by a declarant having sufficient knowledge of the subject

50

is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) The party seeking to admit a hearsay statement under Evidence Code section 1230 must demonstrate that (1) the declarant is unavailable, (2) the declaration was against the declarant's penal interest when made, and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*); *People v. Brown* (2003) 31 Cal.4th 518, 535.)

There is no dispute on appeal that Mendes's hearsay statement was a declaration against penal interest. Mendes died in 1994 and was unavailable to testify. After listening to the recorded interview and reviewing the transcript, the trial court found that Nelson was making every effort to give truthful answers about an interaction that had occurred close to 30 years ago.[9] The trial court observed that in trying to recall specifically what had been said, the "one constant that Lonnie Nelson recalled" was Mendes saying " '[w]hen you got them by the neck and you look them in the eyes and their eyes turn to blueberries.' " The prosecutor, in arguing against admissibility, asserted that the phrase " 'eyes turn to blueberries' " did not support an inference that a person was killed but acknowledged that it was "clearly an admission that someone was strangled, was choked."

Mendes's reference to strangling or choking a person was against his penal interest because it appeared to implicate him in a criminal act. (*Duarte*, *supra*, 24 Cal.4th at

---

[9] We include this observation of the trial court for completeness but note that the credibility of the in-court witness is not a proper consideration in evaluating the admissibility of a declarant's hearsay statement pursuant to Evidence Code section 1230. (*People v. Cudjo* (1993) 6 Cal.4th 585, 608 (*Cudjo*).)

p. 612.)  The statement in front of "a room full of people," as Nelson recalled it, could have subjected Mendes to the risk of civil or criminal liability, and certainly could made him "an object of hatred, ridicule, or social disgrace in the community . . ." as defines a general declaration against interest.  (Evid. Code, § 1230.)  The statement also contained some indicia of trustworthiness, in that it occurred spontaneously at a social gathering in the presence of casual acquaintances, and apparently without concern of consequence. The spontaneous and informal circumstances, coupled with the fact that Mendes's statement was " 'specifically disserving' " and did not try to shift blame, offered sufficient assurance of trustworthiness.  (*Duarte*, *supra*, at p. 614; see also *Cudjo*, *supra*, 6 Cal.4th at pp. 607-608.)  These factors together supported the trial court's conclusion that Mendes's statement qualified as a declaration against interest.

### b.  *Mendes's Statement Was Not Admissible as Third Party Culpability Evidence*

The closer question concerns the admissibility of the statement as evidence of third party culpability for Munoz's murder, and whether its probative value was substantially outweighed by a substantial danger of undue prejudice.

Holland asserts that just as other admissible evidence linked Mendes to the commission of the Munoz murder and warranted a jury instruction on the defense (which the trial court properly gave), the evidence of Mendes's statement to Nelson was relevant to Mendes's culpability.  Holland posits that because he met the threshold standard for a third party culpability defense, "all additional evidence tending to prove or disprove a disputed fact in connection with that defense was admissible, even if that additional evidence did not, standing alone, show Mendes was the actual perpetrator."  In support, Holland cites the broad statutory standard for relevance as evidence "having *any* tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210, italics added.)  Holland argues that Mendes's declaration against penal interest did not merely suggest a predisposition for

52

violence. Rather, he argues that when considered in conjunction with other evidence tying Mendes to the crime, jurors could reasonably infer that Mendes's statement showing that he strangled a girl was an admission that he strangled Munoz.

The People disagree with Holland's premise that the admission of evidence to support a third party culpability defense opened the door to all additional evidence that tends to prove or disprove a disputed fact related to the third party defense. They argue that the admission of third party culpability evidence "does not throw a trial open to illegitimate propensity evidence in the form of vague statements by a third party made years after the crime." The People submit that the statement that Nelson heard did not link Mendes " 'directly or circumstantially to the actual perpetration of the crime.' " (*Elliott*, *supra*, 53 Cal.4th at p. 580.) Because Mendes's statement did not refer to Munoz or to any details like stabbing or rape that would have tied the statement to her murder, the People contend that the trial court was well within its discretion to conclude that the statement was not relevant to prove that Mendes killed Munoz and was more akin to inadmissible propensity evidence.

The People compare the exclusion of Mendes's declaration against penal interest to the trial court's exclusion of discrete instances of choking committed by Holland. The trial court excluded evidence of certain acts which were not committed during a rape and thus were not like the conduct against Munoz.[10] The People note that the trial court exercised its discretion to exclude those acts as improper propensity evidence under Evidence Code section 1101. They argue the court had equal justification to exclude Mendes's nonspecific choking statement on the same grounds.

---

[10] The trial court excluded evidence proffered by the prosecution of two separate incidents in which Holland allegedly choked a victim. One instance involved Holland choking his younger sister by hanging her by the neck in the garage of their house using a water hose. The other instance involved him choking a woman he was dating to the point where she thought she was going to die.

The People further contend that the trial court properly exercised its discretion to exclude Mendes's declaration against interest under Evidence Code section 352. They assert that the evidence had minimal probative value since it was unclear whether Mendes was discussing a real event, whether that event resulted in someone's death, and whether the victim was Munoz, whereas on the other hand the statement created a substantial likelihood of undue prejudice to the prosecution because of the jury's potential likelihood to misuse the statement as improper character evidence.

We find that the trial court's decision to exclude Mendes's declaration against penal interest was not an abuse of discretion. The trial court has wide discretion in determining relevance but lacks discretion to admit irrelevant evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.) In this case, the trial court listened to Nelson's recounting of what he heard Mendes say and noted that Nelson could articulate only one constant, which was the grabbing or squeezing of the neck and the eyes turning to " 'blueberries.' " Nelson said to the investigator, "I don't know, that was about it, *then they die or something*." (Italics added.) Nelson's belief that Mendes was describing a murder by strangulation and that Mendes was a "killer" did not make it so for purposes of the relevance determination before the court. The trial court in fact found that given Nelson's impression of the moment as "dramatic," he "would have specifically recalled" if Mendes had said that he had killed someone or had watched them die, or if he had mentioned Munoz. Instead, it was not clear whether the eyes turning to blueberries meant that the person had died, and who was the victim. Nelson explained that Mendes "was talking about a girl when he said choke and you see their eyes turn to blueberries," though that fact was not expressed in the hearsay statement as recollected by Nelson, nor was there evidence to show the girl was Munoz. The trial court thus found that Mendes "never mentioned any specific person when generally describing the choking of women. He never mentioned killing anyone while choking them or watching them die."

We cannot say, based on this evidence, that the trial court erred in finding that Mendes's declaration against penal interest failed to meet the test of admissibility as evidence of third party culpability. The test of relevance, generally, is whether the evidence tends " ' " ' "logically, naturally, and by reasonable inference" ' to establish material facts . . . .' " ' " (*Carter*, *supra*, 36 Cal.4th at p. 1166.) The material fact in dispute here, as the trial court correctly noted, was who killed Munoz. The trial court in effect paraphrased the rule for admissible evidence to support a third party culpability defense: that admissible evidence " 'must link the third person either directly or circumstantially to the actual perpetration of the crime.' " (*Elliott*, *supra*, 53 Cal.4th at p. 580.) This third party culpability context does not alter the breadth of the relevancy standard. But it does narrow the "disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210) to the actual perpetration of the crime and whether the proffered evidence could raise a reasonable doubt as to the defendant's guilt. (See *Elliott*, *supra*, at p. 580.) Because the proffered evidence in this case lacked any specifics tying the statement directly or circumstantially to the killing of Munoz, the trial court reasonably concluded that Mendes's statement merely displayed a character for violent conduct.

Holland challenges the characterization of the evidence as improper character evidence. He contends that the defense did not seek to admit the statement to show that Mendes had a propensity to strangle girls (cf. Evid. Code, § 1101, subd. (a)) but rather as evidence that Mendes had murdered Munoz (*id*., § 1101, subd. (b)), because his statement could be construed as an admission of the crime. This argument stumbles on the same relevancy hurdle just discussed. That is, Mendes's declaration against penal interest may be reasonably construed as admitting a crime, but the inference which Holland seeks to draw—that the crime was the murder of Munoz—is unsupported by the proffered evidence. The trial court could reasonably conclude that without some measure of detail to tie Mendes's depiction of squeezing a neck until the eyes turn to blueberries to the

55

strangulation of Munoz, the jury would be forced to speculate. This falls short of the standard for relevance. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 682 ["evidence which produces only *speculative* inferences is *irrelevant* evidence"]; accord *People v. Stitely* (2005) 35 Cal.4th 514, 549-550 ["Speculative inferences are, of course, irrelevant."].)

Holland argues, however, that the other evidence admitted at trial tending to connect Mendes to the murder bridged any inferential gap. We agree, as a general principle, that the trial court may consider how other evidence adduced at trial could enable the jury to draw a reasonable inference from evidence that otherwise could not support the inference when viewed in isolation. (See, e.g., *People v. Jones* (2017) 3 Cal.5th 583, 609 [upholding trial court's relevancy determination in admitting a recorded telephone call of the defendant, because "[t]he jury could have inferred consciousness of guilt from the taped conversation, *particularly when also considering other evidence adduced at trial*"], italics added.) At the same time, the fact that some evidence of third party culpability has cleared the relevance threshold does not render the admission of all related, third party evidence inevitable.

Mendes's statement differed from the other evidence admitted to support Holland's third party culpability defense. As the trial court noted, the other third party culpability evidence directly or circumstantially linked Mendes to Munoz's murder in the Lawsons' house, whether based on proximity in time and vicinity (Mendes's absence from Scott Wortman's driveway around the time of the murder), statements made shortly after in direct reference to the murder (Mendes telling officers and others that he did not know whether he did it, or mumbling in front of friends the next night that he "shouldn't have killed that girl"), and physical evidence linking him to the Lawsons' house (Mendes's possession of stolen jewelry and pills). By contrast, Mendes's provocative but nonspecific declaration against penal interest offered no clear nexus to the crime perpetrated. We conclude that even coupled with the admissible evidence of third party

56

culpability, any inference that Mendes's statement was about Munoz was sufficiently tenuous—even speculative—that the trial court did not abuse its discretion in excluding it under the standard for relevant third party culpability evidence.

Having found that the trial court did not abuse its discretion in excluding the evidence on admissibility grounds, we need not address Holland's contention that the court abused its discretion in ruling that the evidence should also be excluded under Evidence Code section 352. We simply note that the nonspecific nature of Mendes's statement diminished its probative value in relation to the danger cited by the trial court of misleading and confusing the jury. Holland emphasizes that a trial court's broad discretion to exclude otherwise admissible evidence "should favor the defendant in cases of doubt because in comparing prejudicial impact with probative value the balance 'is particularly delicate and critical where what is at stake is a criminal defendant's liberty.' " (*People v. De Larco* (1983) 142 Cal.App.3d 294, 306; see *People v. Lavergne* (1971) 4 Cal.3d 735, 744.) That balancing framework presupposes admissibility, whereas in this case the trial court reasonably concluded that the evidence was *not* admissible as third party culpability evidence.

### 4. *Exclusion of Mendes's Declaration Against Penal Interest Did Not Violate Holland's Federal Rights to Due Process and Compulsory Process*

Holland asserts that even if the exclusion of Mendes's declaration against penal interest was not erroneous under state evidentiary rules, its exclusion impinged on his ability to present a complete defense to the jury, violating his rights under the Sixth and Fourteenth Amendments to the United States Constitution. We find that Holland has not demonstrated a federal constitutional violation.

It is well established that " 'the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Jones* (1998) 17

57

Cal.4th 279, 305.)  Holland acknowledges this general principle, which the California Supreme Court has continued to reaffirm.  (See, e.g., *People v. Lawley* (2002) 27 Cal.4th 102, 155 (*Lawley*) [noting "[t]he general rule remains" that states' application of criminal trial rules and procedures do not impermissibly infringe on constitutional rights to present a defense].)  But he contends that the exclusion of Mendes's statement comes within the rare exception to the general rule, set forth most notably in *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*).

The defendant in *Chambers*, charged with murdering a police officer, sought to establish the culpability of another person named McDonald who had signed a sworn confession to the crime and had made several inculpatory statements to others saying that he had shot the officer.  (*Chambers*, *supra*, 410 U.S. at pp. 288-289.)  The defense called McDonald as a witness at trial, but he repudiated his confession and denied any involvement.  (*Id.* at p. 291.)  Due to the combined application of certain state rules of evidence, the defendant was unable either to cross-examine McDonald or to call those witnesses who would have testified to McDonald's inculpatory statements and discredited his repudiation.  (*Id.* at p. 294.)  The high court held that the effect of the state's evidentiary rules, which both precluded impeaching a party's own witness (preventing the defense from cross-examining McDonald) and limited admissions of hearsay declarations against penal interest (excluding McDonald's inculpatory statements), together deprived the defendant of "a trial in accord with traditional and fundamental standards of due process."  (*Id.* at p. 302.)  The court emphasized that its conclusion was bound by the facts and circumstances of the case and did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures."  (*Id.* at pp. 302-303.)

Holland cites *Chambers* for the proposition that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  (*Chambers*, *supra*, 410 U.S. at

58

p. 302.) But we do not find that Mendes's statement to Nelson carried the same critical relevance to Holland's defense, or even similar markers of reliability, as the inculpatory statements in *Chambers*. Far from being "applied mechanistically" (*ibid*.), the trial court carefully evaluated the proffered evidence and found that while excepted from the hearsay rule it failed to tie Mendes either directly or circumstantially to Munoz's murder. This is a distant cry from the repeated exclusion of the hearsay statements in *Chambers* that not only "bore persuasive assurances of trustworthiness . . . well within the basic rationale of the exception for declarations against interest" (*ibid*.) but made direct reference to the police shooting shortly after the murder had occurred and were corroborated by eyewitness testimony (*id*. at p. 300). The nature and scope of the evidence excluded in *Chambers*, consisting not only of three witnesses' independent testimony of McDonald's statements naming himself as the murderer, but also of the defendant's ability to cross-examine McDonald on his repudiation (*id*. at pp. 298-299), further sets it apart from the facts present in our case.

According to one federal court, the unique combination of factors that deprived the defendant of due process in *Chambers* means that the United States Supreme Court "has rarely used it to overturn convictions and in recent years has made clear that it can be invoked only in extreme cases." (*Fortini v. Murphy* (1st Cir. 2001) 257 F.3d 39, 46.) A plurality of the high court observed after *Chambers* that its "holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 53; see also *United States v. Scheffer* (1998) 523 U.S. 303, 308.)

Application of these principles in California has followed the same trajectory. Our Supreme Court has explained that only in "extraordinary and unusual circumstances" does federal constitutional error arise from the ordinary application of the rules of

evidence. (*People v. Abilez* (2007) 41 Cal.4th 472, 503.) The court has rejected the notion that a trial court commits constitutional error whenever it individually assesses and rejects material defense testimony, though "the constitutional right to present and confront material witnesses may be infringed by *general rules* of evidence or procedure which preclude material testimony . . . for arbitrary reasons, such as unwarranted and overbroad assumptions of untrustworthiness. . . ." (*Cudjo*, *supra*, 6 Cal.4th at p. 611.) The analysis of third party culpability evidence in *Lawley*, *supra*, 27 Cal.4th 102 illustrates the court's approach to federal due process concerns arising from the exclusion of potential defense evidence.

The defendant in *Lawley* claimed constitutional violations based on the exclusion of evidence proffered to show that a prison inmate by the name of Seabourn had killed the victim in a contract murder ordered by the Aryan Brotherhood prison gang. (*Lawley*, *supra*, 27 Cal.4th at p. 151.) The defendant declined to call two witnesses after the trial court limited the admissibility of Seabourn's hearsay statements. (*Id*. at p. 152.) On appeal, the court found no abuse of discretion in the ruling to exclude the evidence that failed to come within the hearsay exception for a declaration against penal interest and further rejected, among others, the contention that the evidentiary rulings had violated the defendant's rights to due process and a fair trial. (*Id*. at pp. 154-155.) The court was not convinced "that the excluded evidence possessed sufficient reliability to demand its admission." (*Id*. at p. 155.) In rejecting the due process argument, it cited the traditional presumption that applying " ' "the ordinary rules of evidence do[es] not impermissibly infringe on the accused's [constitutional] right to present a defense." ' " (*Ibid*.)

Holland insists that Mendes's statement was highly relevant because it served to admit that he strangled a girl—and Munoz died by strangulation. For the reasons expressed *ante*, we find this relevance analysis strained at best. The admissibility of the challenged evidence did not depend on whether Mendes's hearsay statement was damaging to Mendes generally, as a declaration against penal interest, but on whether it

60

tended to prove his culpability for the crime charged and thus might have raised a reasonable doubt as to Holland's guilt for Munoz's murder. (*Elliott*, *supra*, 53 Cal.4th at p. 580.) We find that the uncertain connection between Mendes's statement and any specific crime, let alone the crime charged, limited its relevance as third party culpability evidence. Like in *Lawley*, the trial court evaluated the proffered testimony and ruled on admissibility according to the rules of evidence. (*Lawley*, *supra*, 27 Cal.4th at pp. 154-155.) The ruling to exclude Mendes's statement was not "extraordinary and unusual" (*Abilez*, *supra*, 41 Cal.4th at p. 503) in its effect, which did not diminish Holland's ability to present a robust third party culpability defense focused entirely on the possibility that Mendes killed Munoz.

In sum, we find no abuse of discretion in the trial court's decision to exclude Mendes's statement about choking or strangling a girl. The statement shocked and disturbed Nelson, who believed Mendes was a killer, but bore no indication that it either directly or circumstantially linked Mendes to the perpetration of Munoz's murder. (*Elliott*, *supra*, 53 Cal.4th at pp. 580-581.) Under the circumstances, the exclusion of the evidence did not impair Holland's ability to present a complete third party culpability defense and did not rise to the level of a due process or compulsory process violation. (See *Lawley*, *supra*, 27 Cal.4th at p. 155; cf. *Chambers*, *supra*, 410 U.S. at p. 302.)

### 5. *Any Error in Excluding Mendes's Statement Was Harmless*

Our conclusion that the trial court did not err in excluding Mendes's declaration against penal interest makes it unnecessary to consider whether the asserted error was prejudicial. But even assuming the trial court abused its discretion and erroneously excluded Mendes's statement, Holland cannot demonstrate reversible error.

Holland cites both standards of prejudice—the *Chapman* test for federal constitutional error, which requires reversal unless the respondent can demonstrate the error was "harmless beyond a reasonable doubt" (*Chapman v. California* (1967) 386 U.S.

61

18, 24), and the *Watson* test for state law error, which asks whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People v. Watson* (1956) 46 Cal.2d 818, 836).  Absent some citation to case authority suggesting that the assumed, erroneous exclusion of defense evidence under state law here triggers the more rigorous *Chapman* standard of review, we apply the state law test.  This is consistent with the California Supreme Court's observation that even in capital cases, the court has "consistently assumed" that the applicable standard of prejudice for a trial court's erroneous exclusion of defense evidence, including third party culpability evidence, "is that for state law error" under *Watson*.  (*Cudjo*, *supra*, 6 Cal.4th at p. 611.)

Holland emphasizes that *Watson* error does not require a defendant to show that it is "more likely than not" that a more favorable outcome would have been obtained, only that there would be "a *reasonable chance*, more than an *abstract possibility*."  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)  He maintains that this standard is readily met, because the excluded evidence showed Mendes admitting to manually strangling a girl and pointed to him as Munoz's killer, while the case against Holland was not overwhelming.

We have already rejected Holland's contention that the evidence against him was not overwhelming, as discussed at length *ante* (part III.A.3.b.).  While the DNA evidence did not foreclose the defense's theory that Holland had engaged in consensual sex earlier that day with Munoz, substantial evidence in the record pointed toward the opposite inference.  The impeachment of witnesses, including the women who testified that Holland had raped them and sometimes choked or applied a knife to them, did not seriously undermine the consistency of the propensity evidence or discredit the incriminatory statements attributed to him.  The jury's affirmative finding on the rape-murder circumstance confirms the strength of the inferences that linked Holland, as the donor of the sperm found in Munoz, to the commission of the murder.

62

Holland contends that the excluded evidence was critical because it added a new dimension to the evidence incriminating Mendes. He argues that unlike the admitted evidence, which only associated Mendes with the murder locale or raised suspicion of his involvement, Mendes's graphic description was consistent with the bulging eyes and broken blood vessels that occur in a victim who has been strangled and thus implied that he was the one who strangled Munoz. He also contends that without this evidence the case for reasonable doubt was much weaker, since Mendes equivocated in his incriminating statements to other witnesses, and the circumstantial evidence like Mendes's disappearance from Wortman's driveway and possession of property from the Lawsons' house did not confirm his presence at the time of the murder.

Considering the full range of evidence presented, the jury's verdict had to hinge in large part on the evidence that Holland's sperm was found in Munoz and that the jury believed the perpetrator killed her while engaged in the commission of a rape. The admission of Mendes's statement about choking or strangling a girl might have increased the jury's preoccupation with Mendes's possible presence during or even role in the crime, but it is unclear how it would have raised a reasonable doubt as to Holland's culpability. The prosecutor emphasized this point in his closing argument, noting that the elements charged covered "different factual situations, depending upon whether or not you decide or you believe Brian Mendes was involved in some way or if it was just the defendant. So this special circumstance allows for both possibilities and instructs you on what to do depending upon your findings."

We conclude that given the jury's rejection of the defense's theory of third party culpability in this case and its affirmative finding on the rape-murder special circumstance, the introduction of Mendes's statement at trial would not have resulted in more than an abstract possibility of a result more favorable to Holland.

63

## C. Cumulative Prejudice

We likewise reject Holland's assertion of reversible error based on the cumulative impact of the denied motion for mistrial and the exclusion of Mendes's declaration against penal interest.

Our Supreme Court has explained cumulative prejudice in terms of the standard for reversible error: "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. . . . Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Cumulative error depends on any number of errors whose aggregate prejudicial effect must be considered in deciding whether the defendant's "guilt or innocence was fairly adjudicated." (*Hill*, *supra*, at p. 844.) In *Hill*, the court found that "the sheer number of instances of prosecutorial misconduct and other legal errors raise[d] the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*Id*. at p. 845.) The court concluded that the cumulative impact of those errors had in fact deprived the defendant of a fair trial. (*Id*. at p. 847.)

The premise of cumulative error fails, however, where, as here, the defendant has not established error and there is no cumulative prejudicial impact to gauge. (See *People v. Salcido* (2008) 44 Cal.4th 93, 156 [rejecting cumulative error claim for guilt phase of capital trial, because the defendant had not established error].)

## D. Corrections to the Restitution Fine and Parole Revocation Fine

The trial court at sentencing made a general restitution order, ordered Holland to pay a restitution fine of $200 pursuant to section 1202.4, subdivision (b)(2), and imposed but suspended a parole revocation fine of $200 pursuant to section 1202.45. The trial court stated that it was imposing a $200 restitution fine to ensure that as much money as

possible collected from Holland would go to the victims for their losses, as opposed to the state.

Holland identifies two errors that may be easily remedied.

### 1. *The Restitution Fine Amount Must Be Reduced Consistent With the Law at the Time the Crimes Were Committed*

First, imposition of the $200 restitution fine pursuant to section 1202.4, subdivision (b)(2), violated the ex post facto clause because the enactment of the statutory provision authorizing that amount postdated the murder of Cynthia Munoz.

The Legislature added section 1202.4 to the Penal Code on September 27, 1983, and the legislation became operative by its own terms on January 1, 1984. (Stats. 1983, ch. 1092, §§ 320.1, 427; see *People v. Palomar* (1985) 171 Cal.App.3d 131, 133-134 [discussing the enactment of § 1202.4 and effect of its operative date on offenses committed prior].) For many years, until 2012, the minimum restitution fine was $200.[11] (See Stats. 1994, ch. 1106, § 2 [setting the minimum fine at $200]; Stats. 2012, ch. 868, § 3 [increasing the minimum fine effective Jan. 1, 2012].) Munoz was killed on August 7, 1983, before the enactment of section 1202.4. The applicable statute pertaining to restitution fines at that time was former Government Code section 13967, subdivision (a), which in relevant part set $10 as the minimum amount.[12] (Stats. 1981, ch. 166, § 3.)

---

[11] Holland's sentencing took place on July 2, 2015. The minimum restitution fine at that time for a felony was $300. (Stats. 2012, ch. 868, § 3 [setting the minimum restitution fine to $240 effective Jan. 1, 2012, $280 starting on Jan. 1, 2013, and $300 starting on Jan. 1, 2014].) The trial court may have mistakenly believed the minimum restitution fine was still $200. The error, however, is inconsequential since the applicable governing statute was in fact the one in place when the crimes were committed.

[12] The restitution fine applicable at the time of the murder was governed by former Government Code section 13967, subdivision (a), which provided as follows: "Upon a person being convicted of a crime of violence committed in the State of California resulting in the injury or death of another person, if the court finds that the defendant has the present ability to pay a fine and finds that the economic impact of the fine upon the defendant's dependents will not cause such dependents to be dependent on public welfare (continued)

65

"A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws." (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30; accord *People v. Souza* (2012) 54 Cal.4th 90, 143.)  The parties here agree that in imposing a restitution fine, the trial court was proscribed from imposing a punishment more burdensome than what was authorized when the crime was committed.  (*People v. Saelee*, *supra*, at p. 30; see *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 294-295 [interpreting the federal and state ex post facto laws].)  Instead, the trial court should have applied the law in effect when Holland committed the offenses charged.

Holland contends that his trial counsel rendered ineffective assistance by failing to object to the fine.  The People submit that this court may address the issue even in the absence of an objection at trial without considering the ineffective assistance of counsel argument.  (*People v. Zito* (1992) 8 Cal.App.4th 736, 741-742 [noting that reviewing court's ability to correct unauthorized sentence applies equally to the imposition of restitution]; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248-1249.)  Indeed, we conclude that to the extent the restitution fine order constituted an unauthorized sentence, we may modify the judgment to reflect the correct restitution fine amount, as other courts have done.  (See, e.g., *People v. Saelee*, *supra*, 35 Cal.App.4th at p. 31 [modifying restitution fine amount to correct ex post facto violation]; *People v. Souza*, *supra*, 54 Cal.4th at pp. 144-145 [modifying victim/witness restitution amounts to correct ex post facto and other errors].)

The trial court in this case expressed its intent to impose what it believed was the minimum restitution fine so that Holland could direct any money earned to fulfilling direct victim restitution.  We find that in lieu of remand, the judgment may be modified

the court shall, in addition to any other penalty, order the defendant to pay a fine commensurate with the offense committed, and with the probable economic impact upon the victim, of at least ten dollars ($10), but not to exceed ten thousand dollars ($10,000)." (Stats. 1981, ch. 166, § 3.)

and the abstract corrected to reduce the restitution fine to the appropriate $10 minimum, consistent with the statutory minimum applicable in August 1983.

### 2. *The Parole Revocation Fine Must Be Stricken*

The second issue closely tracks the first. The trial court imposed and stayed a parole revocation fine of $200 pursuant to section 1202.45. The legislation that added section 1202.45 was enacted in 1995, more than 10 years after the crimes committed here. (Stats. 1995, ch. 313, § 6.) Holland contends, and the People agree, that imposition of the parole revocation fine violated the ex post facto laws. (See *People v. Callejas* (2000) 85 Cal.App.4th 667, 676 [holding that the ex post facto clause applies to parole revocation fine where parolee committed the underlying crime prior to enactment of the fine].) Holland also contends, and the People agree, that a court may not impose a parole revocation fine when the defendant is sentenced to life without parole. (*People v. Battle* (2011) 198 Cal.App.4th 50, 63.)

Both contentions are correct. Section 1202.45 requires the assessment of a parole revocation fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole. . . ." (*Id*., subd. (a).) The trial court imposed a life sentence without the possibility of parole. Holland's sentence included no additional determinate term of imprisonment, as would trigger the imposition of section 1202.45. (Cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) The trial court accordingly erred in assessing the parole revocation fine. Even if Holland had been sentenced to a determinate term, imposition of a parole revocation fine would be prohibited by the ex post facto clauses, since the underlying crime occurred before the enactment of section 1202.45. (*People v. Callejas*, *supra*, 85 Cal.App.4th at p. 676.)

For these reasons, the parole revocation fine will be stricken.

## III.   DISPOSITION

The judgment is modified as follows.  The parole revocation fine (Pen. Code, § 1202.45) is stricken.  The amount of the restitution fine is reduced from $200 (under Pen. Code, § 1202.4, subd. (b)(1)) to $10 (under former Gov. Code, § 13967, subd. (a)).  As modified, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment to reflect the changes, and the clerk of the superior court is directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

DANNER, J.

*People v. Holland*
H042634